A. CASSIDY, Plaintiff-Appellant, v. AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants-Appellees.

First District (1st Division)   No. 77-1190

Opinion filed May 15, 1978.

Lipnick, Barsy & Joseph, of Chicago (Burton Joseph, of counsel), for appellant.

Kirkland & Ellis, of Chicago (Don H. Reuben, Lawrence Gunnels, and Shane H. Anderson, of counsel), for appellees.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Arlyn Cassidy (plaintiff) filed a two-count complaint seeking actual and punitive damages, as well as injunctive relief, from American Broadcasting Companies, Jay Levine, Don Ernst, Myron Renfrow and William Purdy (defendants). Count I alleged eavesdropping in violation of section 14—2 of the Illinois Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 14—2). Count II alleged invasion of plaintiff's right to privacy. Upon consideration of memoranda of law filed by the parties, discovery depositions and an affidavit by plaintiff, the court granted defendants' motion for summary judgment.

Plaintiff appeals. He contends defendants' actions constitute eavesdropping as defined in the Illinois Criminal Code; the complaint states a cause of action for invasion of privacy and any issue of consent is at best a disputed factual question. Defendants contend plaintiff has no cause of action for either eavesdropping or invasion of privacy and that,

in view of the depositions and affidavit, plaintiff clearly consented to the filming complained of.

A review of the factual elements in the record is essential. In his deposition plaintiff stated that on November 6, 1975, he and several other Chicago police officers, acting as undercover agents, were assigned to investigate a massage parlor on the near north side of Chicago. During the preceding two days, this establishment had been the site of arrests premised upon solicitation and obscenities. The vice-control division of the police department provided plaintiff with $60 to cover the initial undercover investigatory activities. Plaintiff stated he paid $30 admission fee to see "de-luxe" lingerie modelling. He was taken to a small room by one of the models. (Room No. 1.) Upon entering the room he noticed "camera lights" on each side of the bed. He remarked to the model that the lights made the room quite warm. Plaintiff stated he then reclined on the bed and watched the model change her lingerie several times. He made several suggestive remarks and physical advances to her. He arrested the model for solicitation after she established "sufficient" physical contact with him. Three of the other undercover agents joined plaintiff and asked if anyone was in the room adjacent to the room in which plaintiff observed the model. (Room No. 2.) The door to Room No. 2 opened, someone cried out "Channel 7 News" and the camera crew exited filming the scene before them.

Plaintiff further stated that after he and the model were in the room for some 10 minutes, the model told him "they were taking movies." Plaintiff stated he did not believe the model's statement but waved his hands and pretended he was being filmed. During the deposition plaintiff was asked, "Were you planning to do anything that you would not want the public to see, hear or record?" He responded, "No."

Depositions were also taken of defendants Jay Levine, Don Ernst and Myron Renfrow; all admittedly part of the camera crew. Levine, the reporter, stated he and the other members of the crew reported to the massage parlor in response to a call from the manager of the parlor. He complained his establishment was the subject of police harassment. The film crew was taken to Room No. 2 where they installed a camera behind a two-way mirror which provided visual access to Room No. 1. Levine explained that as the film crew was only preparing a visual recording it was not necessary to place a microphone in Room No. 1, which was used by plaintiff and the model. No such instrument was ever placed in that room. However, as ABC company policy required "room presence," *i.e.* background sound, to facilitate the subsequent mixing and editing of sound and silent film clips, the crew placed a microphone in Room No. 2. All of the recording equipment was within Room No. 2. When Levine later viewed the film taken of the events in Room No. 1, he was unable to

hear any distinguishable conversation. The microphone in Room No. 2 transmitted only a mixture of incomprehensible sounds.

All members of the film crew remained in Room No. 2 throughout the interaction between plaintiff and the model and filmed this event. Levine also testified that as plaintiff entered Room No. 1, plaintiff said, "What is this? Are we on camera? Are we on TV?" Levine explained that these remarks were made before the camera had been started for the filming.

Don Ernst, the sound technician, stated in his deposition that he was wearing earphones and had a portable amplifier around his neck. He placed a microphone on a shelf in Room No. 2 to record "room presence." He explained that it would have been possible to disconnect the amplifier and microphone from the camera and record only a visual sequence, but because of ABC policy requiring "room presence," he utilized the microphone. He noted that because of the street noises emanating through a window facing Wells Street in Room No. 2, as well as the whirring of the camera equipment and other miscellaneous noises, he was unable to hear any conversation occurring in Room No. 1. He stated the sounds he heard were "garbled," "distorted," and "almost unintelligible." Ernst recalled plaintiff stating as he entered Room No. 1, "What are we on, TV?" and the model responding, "Sure, we're making movies."

Myron Renfrow, the lighting technician, also recalled the plaintiff stating, "What are we on, TV?" and the model responding, "Yes, we're making a movie." Renfrow stated this was the only conversation he heard. When the filming started, street noises and camera equipment drowned out the balance of the discussion ensuing in Room No. 1.

In the affidavit accompanying his memorandum in opposition to defendants' motion for summary judgment, plaintiff commented on the remarks made by himself and the model when they entered the room. The plaintiff stated:

> "* * * such conversation * * * was made in the line of my duty and performance as a Police Officer which at the time thereof, I believed possibly referred to a film being taken by [the model] and her coconspirators for sale to me as a putative customer which film would serve as evidence which was the subject of my investigation."

## I.
### *Eavesdropping*

Plaintiff contends that the actions of the film crew in both filming and employing recording equipment constitute eavesdropping within the meaning of section 14—2 of the Illinois Criminal Code of 1961, (Ill. Rev. Stat. 1975, ch. 38, par. 14—2), which provides:

"A person commits eavesdropping when he:

    (a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so with the consent of any one party to such conversation and at the request of a State's Attorney; or

    (b) Uses or divulges, except in a criminal proceeding, any information which he knows or reasonably should know was obtained through the use of an eavesdropping device."

An "eavesdropping device" is defined as "any device capable of being used to hear or record oral conversation* * *." Ill. Rev. Stat. 1975, ch. 38, par. 14—1(a).

■■ It has frequently been held that summary judgment should be granted "if the pleadings, depositions and admissions on file, together with the supporting affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (*Heidelberger v. Jewel Companies, Inc.* (1974), 57 Ill. 2d 87, 92, 312 N.E.2d 601.) In the case before us the facts are not disputed. The issue therefore is whether the summary judgment appealed from was proper as a matter of law.

■■ In our opinion, there are two principles of law which adequately support the result reached by the trial judge and which require its affirmance with reference to the dismissal of count I. The statute provides that a violation occurs when an eavesdropping device is used to hear or record all or a part of a conversation without the consent of any one party thereto. It seems clear that a camera as such is not an eavesdropping device within the purview of the statute cited above because it is not capable of being used to hear or to record a conversation. It is undisputed that the only eavesdropping device used by the defendants was the microphone which was located within Room No. 2 where the camera was set up.

It appears from the deposition that a small amount of the preliminary conversation which occurred when plaintiff entered Room No. 1 was heard by all of the persons stationed with the camera in Room No. 2. However, these bits of conversation were heard with the naked ears of the persons present in Room No. 2. In addition, as soon as the camera started, the resulting noise prevented hearing by occupants of Room No. 2 of sounds emanating from Room No. 1.

■■ In *People v. Giannopoulos* (1974), 20 Ill. App. 3d 338, 314 N.E.2d 237, an informant held a telephone so that a police officer could hear the conversation being carried on. This court held that no violation of the statute above cited occurred. The court held that where an unaided human ear listens to a telephone on which the conversation is being

conducted, this listening does not constitute use of an eavesdropping device within the meaning of the statute. The court described this issue as being "definitively settled by this court* * *." (*Giannopoulos*, 20 Ill. App. 3d 338, 342.) Since defendants used no device of any kind in connection with the activities carried out by plaintiff and the model, we find no violation of the eavesdropping statute in this phase of the case.

Examining the situation from a completely different point of view, and assuming for ease in exposition that an eavesdropping instrument had, in fact, been used, the issue arises as to whether plaintiff here intended his statements to be of a private nature. It appears strongly from the record that, when plaintiff entered Room No. 1 with the model, he questioned her regarding the lights. Plaintiff specifically asked the model if they were "on TV." The model responded, "Sure, we're making movies." It seems logical that if plaintiff intended that his conduct with the model was to be entirely private, he would then immediately have desisted from proceeding any further. However, as plaintiff stated in his affidavit, his conduct was performed in the line of his duty as an officer and if the model possibly wished to sell him a completed film, that would serve as evidence in plaintiff's investigation.

■■ The issue posed by these facts is not exactly a matter of consent. It is rather a problem of determining whether plaintiff intended that his conduct was to be of a private nature. In *People v. Klingenberg* (1975), 34 Ill. App. 3d 705, 339 N.E.2d 456, the defendant was arrested for driving while intoxicated. He was requested to perform certain physical acts intended to determine the extent of his coordination and an audio-visual recording was made of the process. Upon defendant's motion, the trial court suppressed the recording on the theory that it was made in violation of the eavesdropping statute above cited. This court reversed and held that there was no violation of the eavesdropping statute. The court pointed out that defendant's statements were intended to be heard by the police officers. In the case before us, although no verbal statements are involved, it seems clear that defendant intended his conduct and acts with the model to be filmed by whomever was operating the camera. The defendant in *Klingenberg* and the plaintiff in the case before us had no expectation of privacy. Citing various authorities, including *Giannopoulos,* this court held (*Klingenberg*, 34 Ill. App. 3d 705, 708):

> "Under such circumstances, we cannot conclude that the defendant intended his statements to be of a private nature, and we hold that where there is no interception of communication intended by the declarant to be private, there is no eavesdropping."

It follows that upon application of either or both of the principles above set forth, the decision of the trial court regarding count I in the case

before us was correct and summary judgment in favor of defendants on said count is affirmed.

## II.
### Right to Privacy

The common law right to privacy is reaffirmed in the Illinois Constitution of 1970. There is a provision that the people of Illinois shall have the right to be secure against unreasonable "invasions of privacy or interceptions of communications by eavesdropping devices or other means." (Ill. Const. 1970, art. I, §6.) In addition, the Constitution guarantees every person "a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation." (Ill. Const. 1970, art. I, §12.) However, issues relating to these constitutional provisions were neither raised nor decided in the trial court. Construction of these provisions is therefore unnecessary in the case before us and we will proceed with a consideration of the common law right to privacy. See *Bender v. City of Chicago* (1974), 58 Ill. 2d 284, 287, 319 N.E.2d 34.

The fourth edition of Prosser's Handbook of the Law of Torts (Prosser, Torts §117 (4th ed. 1971)) contains a chapter on the right of privacy. The learned writer states four types of invasion of the right of privacy. They are: intrusion, public disclosure of private facts, placing a person in a false light in the public eye or appropriation of name or identity. Plaintiff's theory in the case before us is necessarily limited to the issue of intrusion. The allegations of plaintiff's complaint and his briefs in this court are directed toward an alleged violation of plaintiff's right to be shielded from intrusion upon his privacy.

■■ In our opinion, plaintiff's position contains a fundamental flaw which effectively prevents his assertion of a right to privacy in connection with the instant case. In *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 239 N.E.2d 837, the Supreme Court of Illinois established the status of police officers as public officials and held that an officer had no cause of action against a newspaper for libel unless he bore the burden of showing that the publication was motivated by actual malice. The court affirmed a decision by this court which arrived at the same conclusion. (See *Coursey v. Greater Niles Township Publishing Corp.* (1967), 82 Ill. App. 2d 76, 227 N.E.2d 164.) In reaching this result, our supreme court used this language (*Coursey*, 40 Ill. 2d 257, 264-65):

> "It is our opinion that the plaintiff is within the 'public official' classification. Although as a patrolman he is 'the lowest in rank of police officials' and would have slight voice in setting departmental policies, his duties are peculiarly 'governmental' in character and

highly charged with the public interest. It is indisputable that law enforcement is a primary function of local government and that the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an 'on the street' level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions. The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws."

A similar result was reached by the United States Court of Appeals in a case involving a defamation action brought by Federal drug enforcement agents in *Meiners v. Moriarity* (7th Cir. 1977), 563 F.2d 343. The court pointed out the direct public interest in the performance of Federal agents "whose decisions to search and to arrest directly and personally affect individual freedoms." (*Meiners*, 563 F.2d 343, 352.) In view of the fact that among the defenses which may be raised in a privacy action is the privilege of public report, the libel holdings assume importance in the case before us. The same factors which have impelled so many reviewing courts to protect publication of the utterances of public officials from libel actions, absent actual malice, should be operative to protect publication concerning performance of public duties by police officers and other officials.

■■ In its special defenses to this action, the defendant here alleges with particularity the status of plaintiff as a police officer and a public servant who was in performance of public duties at the time the events here involved took place. Applying this theory to the case at bar, it appears at once that plaintiff was not a private citizen engaged in conduct which pertained only to himself. He was a public official performing a laudable public service and discharging a public duty. In our opinion, under these circumstances no right of privacy against intrusion can be said to exist with reference to the gathering and dissemination of news concerning discharge of public duties.

Plaintiff cites and relies upon *Dietemann v. Time, Inc.* (9th Cir. 1971), 449 F.2d 245. The court there affirmed a verdict in favor of the plaintiff. Agents of defendant entered plaintiff's home by subterfuge and used a hidden camera and concealed electronic instruments. The court rejected the argument of defendant that these activities were indispensable to the gathering of news. (*Dietemann*, 449 F.2d 245, 249.) No comment on the decision is necessary here beyond noting that *Dietemann* was a private individual. The plaintiff in the case before us is a public official.

One additional factor is important here. A frequently cited case on the

right to privacy is *Eick v. Perk Dog Food Co.* (1952), 347 Ill. App. 293, 106 N.E.2d 742. *Eick* involved an unauthorized appropriation of the use of plaintiff's likeness in commercial advertisement. The situation there is different from the case before us which presents an issue of intrusion as a violation of the right of privacy. However, *Eick* may be important here in the sense that it points out that, "The right of privacy is, of course, limited in cases of express or implied consent and in areas of legitimate public interest." (*Eick,* 347 Ill. App. 293, 299.) The limitation arising from the public interest is generally associated with "any informational material of legitimate public interest." (See *Buzinski v. Do-All Co.* (1961), 31 Ill. App. 2d 191, 195, 175 N.E.2d 577.) Another instance of an area of public interest would arise in situations such as involved in *Leopold v. Levin* (1970), 45 Ill. 2d 434, 259 N.E.2d 250. There, the supreme court affirmed dismissal of a suit for alleged violation of the right of privacy. The defendants had published a book drawing upon the actual facts of a murder committed by plaintiff.

We agree with the argument advanced by defendants that the conduct of a policeman on duty is legitimately and necessarily an area upon which public interest may and should be focused. In the situation before us, we need not consider any theory of express consent. That defense was not pleaded by defendant and the issue is not before us. It may be urged with good reason that plaintiff gave consent by implication when he was advised that the incident was being filmed and still proceeded with his investigation. However, this evidence is not an essential part of the case. In our opinion, the very status of the policeman as a public official, as above pointed out, is tantamount to an implied consent to informing the general public by all legitimate means regarding his activities in discharge of his public duties. There is no allegation in any of the pleadings charging defendants or any of them with actual malice or with any wilful attempt to impede police work. The motives of the defendants are not impugned by the record before us. The judgment order appealed from is accordingly affirmed.

Judgment affirmed.

McGLOON and STAMOS, JJ., concur.