**Arnold B. HUSKEY, Plaintiff,**

**v.**

**NATIONAL BROADCASTING COMPANY, INC., Defendant.**

No. 85 C 6906.

United States District Court,
N.D. Illinois, E.D.

April 9, 1986.

Robert Howard, Robert Weissbourd, Lauren Rosenthal, Hartunian, Futterman & Howard, Chicago, Ill., for plaintiff.

William J. Campbell, Jr., Samuel Fifer, Gerald F. Lutkus, Reuben & Proctor, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Arnold B. Huskey ("Huskey"), a prisoner at the Marion, Illinois United States Penitentiary ("Marion"), has sued National Broadcasting Company, Inc. ("NBC"),[1] charging:

1. NBC filmed Huskey without his permission—a common-law invasion of privacy claim (Count I); and

2. NBC breached its contract with Williford to abide by federal regulations prohibiting nonconsensual photography of inmates, a contract of which Huskey was an intended third-party beneficiary (Count II).

NBC now moves for dismissal under Fed.R. Civ.P. ("Rule") 12(b)(6). For the reasons stated in this memorandum opinion and order, its motion is denied.

### Facts [2]

■ On May 29, 1985 an NBC camera crew visited Marion to film a news report on conditions there.[3] They shot numerous scenes, including footage of prisoners. Some scenes were broadcast locally in Chicago May 30, 1985 and some nationally on NBC's June 5 "Today" show (¶ 7).

NBC's crew had Williford's authorization to film (id.). NBC was first told federal regulations prohibit photographing or filming inmates without their consent (¶ 15),

and it agreed contractually with Williford to abide by those regulations (¶ 16).

While the NBC crew was filming, Huskey was alone in Marion's "exercise cage," a room roughly 25 by 30 feet with a concrete floor and surrounding fence (¶¶ 8–9). He was wearing only gym shorts, leaving several distinctive tattoos exposed (¶ 11). His expectation was that the only ones able to see him would be persons "to whom he might be exposed as a necessary result of his incarceration": the guard assigned to watch him, other prison personnel and other inmates (¶ 9).

While Huskey was in the exercise cage, an NBC cameraman aimed his camera at him. For several minutes the camera's red light was lit, indicating it was running and Huskey was being filmed (¶ 12). Huskey told Prison Guard Doane ("Doane") he did not want to be filmed, but Doane failed to prevent the activity (¶ 13). Huskey never consented to being filmed (¶ 17).

Huskey does not know whether footage of him has already been telecast. However, NBC personnel have viewed the material, and the scenes are available for future telecast (¶ 14). Among other forms of relief sought, Huskey asks for an injunction against such future telecast (¶¶ 21, 27).

### Invasion of Privacy

Though "invasion of privacy" is assigned an intellectual pedigree of some 95 years' duration (stemming from Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890)), Illinois is a relative newcomer to the field (see *Leopold v. Levin*, 45 Ill.2d 434, 439–40, 259 N.E.2d 250, 253–54 (1970)).

---

1. Huskey's original pro se complaint was brought against WMAQ–TV–5 and a "John Doe" photographer. After this Court appointed counsel for Huskey, an amended complaint was filed substituting NBC and Marion Warden Jerry Williford ("Williford") as defendants. After Williford then filed a motion challenging venue in this District, Huskey stipulated to his dismissal. Huskey has now filed a Second Amended Complaint (the "Complaint") naming only NBC as defendant.

2. Rule 12(b)(6) principles require this Court to accept as true the Complaint's well-pleaded fac-

tual allegations, drawing all reasonable inferences in Huskey's favor. *Wolfolk v. Rivera*, 729 F.2d 1114, 1116 (7th Cir.1984). All citations to the Complaint will simply take the form "¶ —."

3. Throughout the Complaint Huskey refers to a "film crew" and "filming." NBC Mem. 2 n. 1 says NBC newsgathering is actually done on videotape (and ¶ 12's description of a camera with a red light obviously refers to a video camera). Nothing hangs on the distinction, and this opinion will simply follow the Complaint's usage.

It has become increasingly clear during the tort's entire developmental process that "invasion of privacy" is a misleadingly simple label, for it really embraces several causes of action that overlap each other and the tort of defamation. Illinois follows the approach (first stated by Prosser and later adopted by the *Restatement (Second) of Torts* ("Restatement") (see *id.* § 652A)) that divides invasion of privacy into four categories (*Midwest Glass Co. v. Stanford Development Co.*, 34 Ill.App.3d 130, 133, 339 N.E.2d 274, 277 (1st Dist.1975)):

> (1) an unreasonable intrusion upon the seclusion of another, (2) the appropriation of another's name or likeness, (3) a public disclosure of private facts or (4) publicity which unreasonably places another in a false light before the public.

Huskey Mem. 8 says the first and third of those theories apply to his case:

> 1. He was "engaged in private activities in the most private environment available to him for those activities" (¶ 10), and he "reasonably expected" he would be seen only by the limited group already described (¶ 9). He characterizes the filming as a "knowing, willful and wanton" invasion of his privacy (¶ 20).
>
> 2. He was shown in a fenced-in "cage," wearing only gym shorts, with several distinctive tattoos exposed—an experience that might offend the sensibilities of a reasonable man.[4]

NBC responds in two ways:

> 1. Prisoners are "limited" public figures who lose "substantially all of [their] rights to privacy" while incarcerated (Mem. 3).
>
> 2. Depiction of a person in a "publicly visible area" cannot give rise to an action

for invasion of seclusion or revelation of private facts (Mem. 5–6).

Both attacks on Huskey's claims are far off the mark.

NBC's exposition of its "public figure" argument is both confused and confusing, mingling irrelevant First- and Fourth-Amendment doctrines with elements of the common-law tort. Perhaps stating a few basics will help sort things out.

■ By definition invasion of privacy is intrusion upon, or revelation of, something *private*. Non-private matters logically fall outside the scope of the tort. As Warren and Brandeis quite succinctly put it (4 Harv.L.Rev. at 215, footnote omitted):

> The general object in view is to protect the privacy of private life, and to whatever degree and in whatever connection a man's life has ceased to be private, before the publication under consideration has been made, to that extent the protection is to be withdrawn.

Thus the private character of the matter in suit is an essential element of the plaintiff's case (Restatement § 652D comment b):

> There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public.[5]

■ For that purpose it is irrelevant whether a person has earlier sought the public eye intentionally, for involuntary publicity is publicity nonetheless. Once given it banishes privacy pro tanto (*Beresky v. Teschner*, 64 Ill.App.3d 848, 855, 21 Ill.Dec. 532, 537, 381 N.E.2d 979, 984 (2d Dist.1978)). That tends to be particularly true of crime victims (*Street v. NBC*, 645 F.2d 1227, 1235 (6th Cir.), *cert. dismissed by stipulation*, 454 U.S. 1095, 102 S.Ct.

---

**4.** Huskey's original pro se complaint put the situation even more graphically:

> During this period, like an animal confined in his zoo cage, I was forced to endure this filming-photographing.

**5.** Of course a state could legislatively or judicially seek to confer a private right of action for further publication of public-record matters. That was the situation under Georgia law in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95

---

S.Ct. 1029, 43 L.Ed.2d 328 (1975). But even aside from the obvious First Amendment infirmities posed by such a right of action (*id.* at 495, 95 S.Ct. at 1046), it really distorts the language to call publication of public-record facts "invasion of privacy." More basically, such a tort—if constitutionally valid at all—shares none of the theoretical underpinnings of invasion of privacy at common law.

667, 70 L.Ed.2d 636 (1981)), criminals (*Leopold,* 45 Ill.2d at 442, 259 N.E.2d at 255) and even relatives of suspected criminals (*Rozhon v. Triangle Publications, Inc.,* 230 F.2d 359, 361 (7th Cir.1956); *Beresky,* 64 Ill.App.3d at 855–56, 21 Ill.Dec. at 537–38, 381 N.E.2d at 984–85). Thus NBC rightly observes Huskey's conviction and imprisonment are matters of public record: Any publicity given to *those facts* is simply not an invasion of privacy.

But NBC R. Mem. 2 goes further, arguing Huskey (qua prisoner) is a "limited public figure," a status:

> which greatly reduces his reasonable expectation of privacy and which has the corollary effect of reducing the legal likelihood that his privacy can, in fact, be invaded.

Several distinct arguments can be teased out of NBC's discussion:

1. Publicity given to crimes and trials is sufficient as a factual matter to put virtually all aspects of a prisoner's incarceration in the public eye. Huskey therefore logically had no privacy that was invaded by the filming.

2. There is a "legitimate public interest" in prisoners. Even if the information put on film had not yet come to public attention, Huskey's privacy interest is thus outweighed as a matter of law by the social value of publication. That argument really comes in two forms:

> (a) Persons who attain "public figure" status have traded away their right to be left alone and, having whetted the public appetite for information, cannot reasonably complain of intrusions on their privacy.

> (b) Information about certain public officers and institutions is vital to a properly-functioning society. Public concern for the proper conduct of prison affairs requires some kind of public-

policy exception to privacy rights asserted by prisoners.[6]

3. Prisoners have no legitimate expectation of privacy while in prison, because privacy is largely inimical to the goals of prison administration.

Each of those arguments has some support in the case law. But as the following discussion will show:

1. None of them extends far enough to help NBC in this case.

2. Some of them, though perhaps accurate statements in the abstract, are really irrelevant to the suit Huskey has brought.

*1. Huskey's Privacy-in-Fact*

NBC argues it cannot be held liable for intrusion upon Huskey's seclusion because he was not secluded. Conceding (somewhat inconsistently with its later arguments, as will be seen) a prisoner may have a reasonable expectation of seclusion in his own cell (see *Smith v. Fairman,* 98 F.R.D. 445, 450 (C.D.Ill.1982) (using a Fourth Amendment analysis)), NBC R.Mem. 8 simply contrasts the exercise cage as "apparently open to view and used by other prisoners."

On that score, both parties have engaged in some creative re-reading of the Complaint's allegations. What Complaint ¶ 9 actually *says* is:

> Plaintiff was alone in the exercise cage at all times pertinent hereto. He reasonably expected that he would only be seen by the prison guard assigned to him, who was viewing from above the cage, and by prison personnel and inmates, if any, to whom he might be exposed as a necessary result of his incarceration.

■ Of course Huskey *could* be seen by guards, prison personnel and inmates, and obviously he was in fact seen by NBC's camera operator. But the mere fact a person can be seen by others does not mean

---

**6.** Those two sub-arguments illustrate the ambiguity of the terms "public figure" and "public interest." In a purely factual sense, the public has an interest in or curiosity about the lives of certain "public figures" whose doings are widely advertised. And in a policy sense, the public (the polity) has an interest or stake in the affairs of certain persons or institutions whose conduct affects the quality of people's lives.

that person cannot legally be "secluded." Indeed, one paradigm case of the tort is the Peeping Tom (see Restatement § 652B comment b, illustration 2). Further, Huskey's visibility to some people does not strip him of the right to remain secluded from others. Persons are exposed to family members and invited guests in their own homes, but that does not mean they have opened the door to television cameras. Prisons are largely closed systems, within which prisoners may become understandably inured to the gaze of staff and other prisoners, while at the same time feeling justifiably secluded from the outside world (at least in certain areas not normally visited by outsiders). That concept distinguishes the situations in two cases on which NBC seeks to rely: *Sciringione v. Columbia Broadcasting Co.*, No. CV 78–4197, slip op. at 2 (C.D.Ill. June 26, 1979) (no intrusion where prisoner was photographed while walking to the dining room); *Cox Communications, Inc. v. Lowe*, 173 Ga.App. 812, 328 S.E.2d 384, 385–86 (1985) (inmate photographed in prison yard openly visible to public had no invasion-of-seclusion claim).

■ No case has been cited to this Court (or discovered by independent research) holding that *no* area of seclusion exists within a prison as a matter of law. Whether or not the exercise cage could be considered such an area is a factual question. Huskey's Complaint says he was not in public view and he expressly disapproved of the effort to film him. That is enough for Rule 12(b)(6) purposes.

But NBC goes on to argue it cannot be held liable for intrusion upon Huskey's seclusion because such liability exists only (Restatement § 652B):

if the intrusion would be highly offensive to a reasonable person.

And NBC says its actions, as a matter of law, cannot be deemed "highly offensive to a reasonable person." Seeking to give meaning to the quoted language, NBC cites a portion of Restatement § 652D comment h:

The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern.

However, that quote, drawn from the Restatement's discussion of the "public disclosure of private facts" form of the tort and set in the context of revelations about public figures, simply muddies the waters. Illinois' only case in point, *Bank of Indiana v. Tremunde*, 50 Ill.App.3d 480, 483, 8 Ill.Dec. 57, 59–60, 365 N.E.2d 295, 297–98 (5th Dist.1977) quotes both Restatement § 652B ("highly offensive") and Prosser, *Torts* § 117 [7]:

It is clear also that the intrusion must be something which would be offensive or objectionable to a reasonable man....

*Bank of Indiana* never chose between the two standards, holding the annoyance caused by loading up replevied cattle and equipment for removal was *not even* "unreasonably intrusive" (50 Ill.App.3d at 483–84, 8 Ill.Dec. at 60, 365 N.E.2d at 298). However, there is support for the view that merely photographing a person at home without his or her permission is objectionable enough to state a claim (see *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir.1971)).[8] Indeed, the degree to which NBC's acts were objectionable must in large part depend on the degree to which Huskey was secluded while in the exercise

---

7. *Bank of Indiana* quoted from Prosser's 1971 4th edition, but the language quoted has remained unchanged in the 1984 5th edition, now Prosser & Keeton.

8. It is also noteworthy that the defendants in *Dietemann* were invited into plaintiff's home for the purpose of receiving medical treatment, so it is not as though they were mere trespassers—though it is true their actual purpose in seeking entrance was to photograph and record plaintiff, an alleged quack.

cage. And that also cannot be decided at the pleading stage.[9]

As to the public-disclosure-of-private-facts aspect of Huskey's claim, NBC says first there was no such disclosure because no film of Huskey was ever telecast. That of course is a fact in its possession and outside the Complaint's allegations. Huskey understandably says (¶ 14):

> Plaintiff is presently not certain whether these scenes have already been shown to the television viewing public.

Proofs may show NBC is right, in which case Huskey's damage claim would fail. But he also asks for an injunction against any future telecast, and that obviously takes the wind out of NBC's sails here.

More significantly, NBC R.Mem. 10 says nothing private could have been captured on the film:

> Huskey's amended complaint fails to state a claim because, logically, there are only a limited number of things that could be revealed by the videotape about Huskey given the allegations in his amended complaint, even as expanded by his memorandum; these are the facts that he is incarcerated at Marion and that he has tatoos. Neither of these facts are [sic] sufficiently intimate, personal or private to be considered "private facts" within the meaning of this tort.

Of course Huskey's status as a prisoner is a public record matter. *Perhaps* his tattoos have already been exposed to public view, but that is a cipher here. It is hard to think of a reason why large amounts of a person's skin—decorated or not—cannot be considered "personal" and thus protected against unsought public revelation.[10]

In any event, NBC's contention mistakenly attempts to single out discrete factual items. After all, the tort is as much concerned with the context of information as with the information itself. Photographs of a couple kissing in a public market do not invade their privacy (see Restatement § 652D comment b, illustration 5), but photographing them in a hotel room does (*id.*, illustration 6). Further, the "facts" exposed are not necessarily the only "information" communicated. Photographs of people in embarrassing situations or merely private situations convey the "fact" of that embarrassment or privacy (see Restatement § 652D comment c, illustration 10 (photograph of a woman nursing her child); see also *McCabe v. Village Voice, Inc.*, 550 F.Supp. 525, 529 (E.D.Pa.1982) (photograph of woman taking a bath)).

■ Complaint ¶ 10 says Huskey was engaged in "private activities." While that is not very descriptive, the fact that NBC is "forced to guess" (R.Mem. 10) what those activities were is not fatal on a motion to dismiss. Given the expansive reading of complaints mandated by *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984), Huskey need say nothing more. Film of him (with his tattoos), stripped to his gym shorts, in a cage-like room, engaged in "private activities," is what is on the table at the pleading stage. That is enough to keep his tort claim alive.[11]

### 2(a) Huskey as a "Public Figure"

NBC's most strenuously-asserted argument labels Huskey a "limited purpose public figure" with a "very limited and

---

9. NBC R.Mem. 8–9 says the question whether the intrusion was offensive (or "highly offensive") is one of law for this Court. That might be so on a summary judgment motion with a developed factual record (see *Virgil v. Sports Illustrated*, 424 F.Supp. 1286, 1289 (S.D.Cal. 1976)), but it can hardly be so here.

10. Huskey was not exactly sunning himself on the beach at Cannes, so as to be considered fair game for paparazzi.

11. *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 2592 n. 2, 57 L.Ed.2d 553 (1978) (plurality opinion) sounds startlingly apropos:

> Inmates in jails, prisons, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however "educational" the process may be for others.

That language, however, spoke of intrusion by government officials under a constitutional right-of-privacy analysis. It is not dispositive of Huskey's claim here.

narrow expectation of privacy" (R.Mem. 5). But that argument really says nothing: If a criminal becomes a "limited purpose public figure" by virtue of his or her crime, and if incarceration is an outgrowth of the crime, the inquiry becomes one of defining "limited." That is a question NBC never really answers.

■ True enough, Restatement § 652D comment f says:

Those who commit crime or are accused of it may not only not seek publicity but may make every possible effort to avoid it, but they are nevertheless persons of public interest, concerning whom the public is entitled to be informed.... As in the case of the voluntary public figure, the authorized publicity is not limited to the event that itself arouses the public interest, and to some reasonable extent includes publicity given to facts about the individual that would otherwise be purely private.

But that does not carry the freight NBC is looking for: Publicity surrounding the criminal is permissible "to some reasonable extent," but Huskey claims filming him in the exercise cage was beyond the pale.[12]

Again the inquiry is essentially factual. Criminals may not stave off public reportage of matters associated with a "completely publicized crime" (*Leopold*, 45 Ill.2d at 442, 259 N.E.2d at 255), but the extent of legitimate public curiosity about criminals is bound up with the degree of publicity and the nature of the facts that made a particular criminal a public figure in the first place. For example, someone convicted of odometer fraud may expect to draw publicity if he is found working in a prison auto-repair shop, while a murderer would not. Nothing of record here suggests any reason why anything more than "morbid and sensational" prying (Restatement § 652D comment h) would justify filming Huskey's activities in the exercise cage.

Nor does NBC suggest the film might seriously (*id.*):

throw some light upon the kind of person [Huskey] is, his possible guilt or innocence, or his reasons for committing the crime[, which would be] a matter of legitimate public interest.

■ To prevail (for tort-law purposes) on its "limited purpose public figure" argument, NBC must show why filming Huskey was consistent with the admitted limitation on his public-figure status. That it has not done. And to the extent the filming fell outside legitimate public curiosity, Huskey need not allege the revelation of private facts was "morbid" or "sensational" (*id.*), for that standard applies only to the extent he *is* a public figure (see *Leopold*, 45 Ill.2d at 443, 259 N.E.2d at 255; *Sidis v. F-R Pub. Corp.*, 113 F.2d 806, 809 (2d Cir.1940) (revelations about public figures will "usually not transgress [the] line" to "outrage the community's notions of decency")).

### 2(b). *Public Policy Favoring Disclosure*

■ Even if a prisoner is not a "public figure" in the literal sense, NBC says the legitimate public stake in prison conditions blocks Huskey's action. Illinois law is clear that a person performing official duties has no right of privacy as to information concerning his or her discharge of those duties (*Cassidy v. American Broadcasting Cos.*, 60 Ill.App.3d 831, 837–38, 17 Ill.Dec. 936, 941–42, 377 N.E.2d 126, 131–32 (1st Dist.1978)). But Huskey is plainly not a public officer or official in that sense, and the public has no right to information enabling it to gauge his performance of a public trust he does not have.

Illinois also recognizes a private person who gets involved in business dealings with government cannot claim a right of privacy in facts concerning those dealings

---

12. NBC cites one case, *Buckley v. W.E.N.H.*, 5 Media L.Rep. (BNA) 1509 (D.N.H.1979) apparently holding prisoners are all-purpose continuing public figures "by virtue of [their] crime and subsequent trial" (*id.* at 1510). But in *Buckley* the court first held the prisoner gave his consent to be filmed (*id.* at 1509), making all the "public figure" discussion beside the point. In any event the *Buckley* discussion of a prisoner's "public figure" status is so sketchy that this Court has no disposition to follow it.

(*Adreani v. Hansen*, 80 Ill.App.3d 726, 730, 36 Ill.Dec. 259, 263, 400 N.E.2d 679, 683 (1st Dist.1980)). Those who deal with the public must be held to a high standard of business ethics, so the public may perhaps be entitled to rummage around in such people's past business dealings to see if anything is amiss.

But even if Huskey is a "public figure" in some sense, he is surely not one in *Adreani* or *Cassidy* terms. NBC's effort to wield the "public figure" cudgel so indiscriminately is nonsense.

 Of course the public has a strong and legitimate interest in prison conditions. As Chief Justice Burger's plurality opinion in *Houchins*, 438 U.S. at 8, 98 S.Ct. at 2593 said:

We can agree with many of the respondents' generalized assertions; conditions in jails and prisons are clearly matters "of great public importance." *Pell v. Procunier*, [417 U.S.] [817] at 830 n. 7 [94 S.Ct. 2800 at 2808 n. 7, 41 L.Ed.2d 495 (1974)]. Penal facilities are public institutions which require large amounts of public funds, and their mission is crucial in our criminal justice system. Each person placed in prison becomes, in effect, a ward of the state for whom society assumes broad responsibility. It is equally true that with greater information, the public can more intelligently form opinions about prison conditions. Beyond question, the role of the media is important; acting as the "eyes and ears" of the public, they can be a powerful and constructive force, contributing to remedial action in the conduct of public business. They have served that function since the beginning of the Republic, but like all other components of our society media representatives are subject to limits.

But the issue in *Houchins* was whether prison officials could deny media access to the prison, not whether individual prisoners could refuse to be filmed. And aside from the fact the *Houchins* plurality held the media had no absolute First Amendment right of access to film in prisons (*id.* at 14, 98 S.Ct. at 2596), it proves too much to argue Huskey can state no invasion of privacy claim because the public has a right to know how well he is being treated. *Adreani* and *Cassidy* cannot be stretched that far.[13]

*3. Prisoners' Legitimate Expectations of Privacy*

Finally, NBC resorts to the statement in *New Jersey v. T.L.O.*, — U.S. —, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985):

[P]risoners retain no legitimate expectations of privacy in their cells....

That quotation, ripped out of context, is wholly irrelevant here. True enough, *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) teaches:

Society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell....

But both *Hudson* and *T.L.O.* were Fourth Amendment cases concerning the balance of individual and governmental interests raised by searches—in *Hudson*, of prison cells, and in *T.L.O.*, of students' purses. Thus *Hudson*, 104 S.Ct. at 3200–01 said the reasonableness of a prisoner's expectation of privacy was to be determined by balancing his privacy interests with the prison's security interests—a balance NBC is in no position to assert.

 Indeed, far from assisting the prison officials in their work, NBC broke its promise to leave prisoners alone unless they wanted to be filmed. *Hudson* teaches prisoners may expect large doses of intrusion from prison officials, but it does not in the slightest pare down prisoners' right to

---

13. This is not to denigrate the public stake in sound prison administration. But the argument NBC Mem. 3–4 has really only sketched out is improperly directed at Huskey's ability to state a tort claim for invasion of privacy. If NBC could show filming him was *necessary* to public exposure of improper prison conditions, that might perhaps constitute some sort of defense against Huskey's suit. NBC has made no such defense (maybe advisedly so, for—taking its own R.Mem. 10 allegation as true—it did not even deem the film worthy of telecasting).

be free from *private* intrusions. It follows that Huskey's expectation of privacy vis-a-vis television camera crews was perfectly legitimate.

In summary, Huskey's Count I has made out a claim for invasion of privacy, whether of the intrusion-upon-seclusion or the publication-of-private-facts sort. It remains to consider his Count II claim.

### Breach of Contract

■ Huskey also invokes the benefits of an alleged contract between Williford and NBC providing NBC would abide by federal regulations prohibiting photography of prisoners without their consent. See 28 C.F.R. § 540.62(b) ("Section 540.-62(b)").[14] Huskey claims as an intended (though non-party) beneficiary of that contract.

NBC first says Huskey's contractual claim is simply a bootstrap attempt to avoid the infirmities NBC sees in Huskey's tort claim. Because this Court did not buy NBC's position as to the tort claim, any derivative-infirmity argument necessarily fails as well.

■ Even were that not the case, NBC's contention is dead wrong in conceptual terms. Huskey says the contract required NBC to abide by Section 540.62(b), which does not say the media shall not "invade prisoners' privacy" (in which case a finding NBC did not invade Huskey's privacy would be fatal to his contractual claim as well). Instead Section 540.62(b) reads:

> An inmate has the right not to be photographed and not to have his or her voice recorded by the media. A visiting representative of the media is required to obtain written permission from an inmate before photographing or recording the voice of an inmate participating in authorized programs and activities.

NBC makes no claim it got Huskey's written permission or any permission at all. So even if NBC did not tortiously invade Huskey's privacy, it clearly did not live up to its agreement.

■ Certainly the damage done to Huskey by virtue of NBC's breach is—according to the Complaint—no different from the damage occasioned by the tort. To allow separate recovery on both Counts would be duplicative. But pleading of alternative theories of recovery is an everyday occurrence. Huskey might lose on the tort claim (if for example a fuller record reveals he was not "secluded" in the exercise cage) yet still prevail on the contractual claim, which is not subject to tort defenses.[15]

NBC says even so Huskey has not made out a breach-of-contract claim, because he has alleged no recoverable damages. On that score *Allstate Insurance Co. v. Winnebago County Fair Association, Inc.*, 131 Ill.App.3d 225, 233, 86 Ill.Dec. 233, 239, 475 N.E.2d 230, 236 (2d Dist.1985) says one essential element of a breach-of-contract claim is "resultant injury to the plaintiff." Huskey has pleaded that much, but his claimed injury is entirely mental and emotional, and the general rule is (*Maere v. Churchill*, 116 Ill.App.3d 939, 944, 72 Ill. Dec. 441, 444, 452 N.E.2d 694, 697 (3d Dist.1983)):

> In the contract area, damages for breach will not be given as compensation for mental suffering, except where the breach was wanton or reckless and caused bodily harm, or where the defendant had reason to know, when the contract was made, that its breach would cause mental suffering for reasons other than mere pecuniary loss.

14. NBC Mem. 9–12 urges strenuously those regulations do not create a private right of action. That is wholly beside the point. Whether or not Huskey could sue NBC directly under the regulations, NBC allegedly contracted to abide by them. NBC's failure to do so is the basis of Huskey's claim.

15. For example, an obvious public figure would not be able to sue for invasion of privacy where the private facts revealed were in the legitimate sphere of public curiosity. Yet if a newspaper had contracted with a public figure not to print the information, he or she would have a valid breach of contract claim.

5 *Corbin on Contracts* § 1076, at 429 (1964 ed.) puts the rule this way (footnote omitted):

> If the wilful or wanton infliction of mental suffering, unaccompanied by a bodily injury, is a recognized tort, as in some cases it may be, the fact that the infliction of such suffering is also a breach of contract will not prevent the award of damages therefor. There is sufficient authority to justify the statement that damages will be awarded for mental suffering caused by the wanton or reckless breach of a contract to render a performance of such character that the promisor had reason to know when the contract was made that a breach would cause such suffering, for reasons other than mere pecuniary loss.

NBC can scarcely claim surprise under the terms of its contract. Section 540.-62(b), and hence the contract to that extent, focuses precisely on prisoners' privacy rights.[16] NBC's specific contractual commitment was to preserve those privacy rights by obtaining written permission before filming. That readily distinguishes this case from *Maere*, where the breached contract was for examination of a land title abstract.

■ Further, Huskey has alleged (¶ 13) he attempted to stop the filming, yet the cameraman went ahead anyway. That characterizes the act as not merely negligent or inadvertent but as prima facie willful.

As NBC R.Mem. 13 points out, there is hardly any Illinois law on this point (indeed, *Maere* seems to be the only case). Yet NBC's argument against applying the general rule here is unconvincing: Huskey's relationship to the contract, though as a third party, is intimate; and the damages to him are hardly speculative in the causative sense (while they are no more speculative as to amount than any claim for intangible harm).

16. To its credit, NBC does not even argue Huskey was not an intended third-party beneficiary

■ Finally, NBC argues the Complaint does not allege NBC "knew" Huskey would suffer "serious emotional disturbance" as a consequence of breach, apparently relying on *Restatement (Second) of Contracts* § 353:

> Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract was of such a kind that serious emotional disturbance was a particularly likely result.

Nothing in that section requires actual or subjective knowledge of consequential serious emotional disturbance. All it says is the contract must be "of such a kind" that serious emotional disturbance was likely to result from its breach.

■ That is plainly the case here. By their very nature, contracts not to invade privacy are contracts whose breach may reasonably be expected to cause emotional disturbance. Except for the "commercial appropriation" form of the tort, emotional disturbance is frequently the principal result of such invasions. And though the contract was not explicitly framed in invasion-of-privacy terms, a contract requiring NBC to refrain from nonconsensual filming foreseeably protects the subjects against the same sort of harms. Nor must Huskey plead a "serious" emotional disturbance: *Maere* does not require that, and in any event the extent of Huskey's injury is a matter of proof, not pleading.

NBC also says the Complaint is insufficient because it fails to allege *any* emotional disturbance. All ¶ 27 says is:

> Plaintiff was injured by that breach and the invasion of privacy associated with it.

To the extent Huskey seeks damages for invasion of privacy simpliciter, allowing recovery under Count II would (as previously discussed) duplicate recovery under the tort count. But as a general description of the injury Huskey has suffered, ¶ 27 (read as it must be in conjunction with the rest of

of the NBC-Williford contract.

the Complaint) puts NBC on notice of what is at stake (as NBC's own briefing indicates well enough).

■■■ NBC points to *Allstate Insurance*, 131 Ill.App.3d at 233, 86 Ill.Dec. at 239, 475 N.E.2d at 236 to assert the Illinois doctrine that breach-of-contract complaints are not to be construed liberally. Such reliance on Illinois pleading rules to govern this federal-court proceeding is simply wrong. Rule 8(a) does not call for the specificity Illinois demands, but only:

> (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief to which he deems himself entitled.

No colorable argument can be made that Illinois' pleading rules fall on the "substantive" side of the "substantive-procedural" line established by *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); see also *id.* at 475, 85 S.Ct. at 1146 (Harlan, J., concurring). Huskey's statement of his claim (the contract, its breach and the general nature of his injury) is "short and plain" and hence adequate.

### Injunctive Relief: Constitutional and Nonconstitutional Considerations

NBC's last attack on the Complaint challenges its prayer for an injunction against future telecast of Huskey's footage. NBC's argument in that area focuses principally, though not exclusively, on the notion that such an injunction would be a prior restraint in violation of the First Amendment. That onslaught, though posing a more difficult question, also fails.

■■■ NBC is of course right in saying we must tread gingerly in the area of prior restraints (*Nebraska Press Association v.*

*Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976)):

> The thread running through all these cases is that prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights.

But this is not at all the classic prior restraint case. It does not involve an injunction against publication of the communication of ideas: an anti-Semitic newspaper (*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)) or government documents (*New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)) or public-record information about criminal trials (*Nebraska Press Association*).

What this case rather involves is prevention of a private wrong: invasion of Huskey's privacy. As to that, *Near*, 283 U.S. at 709, 51 S.Ct. at 628, *Nebraska Press Association*, 427 U.S. at 557–58, 96 S.Ct. at 2801–02, and *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971) all suggest an injunction to prevent private wrongs stands on a very different footing from injunctions that suppress the communication of information as such.[17] That difference stems from several factors.

First, the balancing test first articulated in *United States v. Dennis*, 183 F.2d 201, 212 (2d Cir.1950), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) and applied in *Nebraska Press Association*, 427 U.S. at 562, 96 S.Ct. at 2804 (whether "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger") cuts strongly in favor of injunctive relief, for the probability of the evil here is 100% upon publication. Indeed, as to the "publi-

---

**17.** Before appointment to this District Court, the writer engaged in a good deal of First Amendment work, always on what (at least to the writer) seemed the side of the angels—opposing prior restraints or what could arguably be characterized as such. See, e.g., *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir.1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620,

100 S.Ct. 826, 63 L.Ed.2d 73 (1980). But then as now the distinction between resisting injunctions against such informational communications (the classic instance of the prior restraint) and obtaining injunctions against private harms (though the tortfeasor sought to don a First Amendment mantle) made the critical difference. See, e.g., *Austin Congress Corp. v. Mannina*, 46 Ill.App.2d 192, 196 N.E.2d 33 (1st Dist. 1964).

cation of private facts" tort, publication *is* the evil.

Second, *Cox Broadcasting*, 420 U.S. at 491, 95 S.Ct. at 1044 declined to say there was any general First Amendment protection for the publication of "very private matters unrelated to public affairs." Instead *Cox Broadcasting* held the First Amendment bars liability for publication of public record facts. Similarly, at least as to private persons, the First Amendment imposes no restriction on liability for defamation, except of course that there can be no liability without fault (*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). And if the First Amendment thus offers no protection to those who publish private or defamatory matter, it goes without saying there is no prior restraint limitation as to remedy.

Finally, an injunction against telecasting the Huskey footage would be quite narrowly-tailored to serve Huskey's privacy interests, without unduly stepping on NBC's interest in publicizing conditions at Marion. Indeed, as this opinion has already suggested, NBC's own decision not to include the Huskey footage in its telecast indicates no great need for it. NBC is then hard put to it to claim any danger of suppression of worthwhile speech by such an injunction. There is even less danger (if any at all) that the contours of the injunction would chill NBC's freedom of expression through overbreadth or vagueness.

So much then for any constitutional inhibition on the issuance of an injunction. That, however, is not the end of the analysis in this area. NBC R.Mem. 15 also cites the "Illinois rule" exemplified by *Montgomery Ward & Co. v. United Retail Wholesale & Department Store Employees of America*, 400 Ill. 38, 79 N.E.2d 46 (1948). Though that rule (to the extent it derives solely from state law) is irrelevant to the federal constitutional issue, it might nonetheless bear on the substantive law this Court must apply in this diversity case.

Accordingly a brief treatment of the issue is in order.

Hornbook law has long taught that "equity will not enjoin the publication of a libel or slander" (*Venturelli v. Trovero*, 346 Ill. App. 429, 432, 105 N.E.2d 306, 308 (2d Dist.1952)). But that ancient maxim derived in large part from the former separation of law and equity courts. See J. Story, *Commentaries on Equity Jurisprudence* § 1279 (14th ed. by W. Lyon 1918). To the extent *Montgomery Ward* rested on federal constitutional arguments to support the maxim's application,[18] time and the Supreme Court have passed it by. Only to the extent it rested on the lack of "equity jurisdiction" (really not jurisdiction at all but a substantive rule of decision) would *Montgomery Ward* lend some force to NBC's argument here.

But "some force" is not enough. In the first place, there is no true parallel between defamation and invasion of privacy (in its publication-of-private-facts aspect). This opinion need not essay a learned disquisition on the basis for equity courts' hesitancy to enjoin libel. Suffice it to say the key issue is the adequacy of the remedy at law.

It is too late in the day to question whether legal history has rightly or wrongly viewed an action for damages as an adequate libel remedy, but no similar history exists to inhibit such an inquiry as to invasion of privacy (itself an extraordinarily youthful tort). On the contrary, the rights infringed and the harms inflicted by invasions of privacy make that tort more analogous to a trespass than to libel (an affront to reputation). It is equally well-established that equity will enjoin trespassers if they "would impair the just enjoyment of the property in future" (Story, *Commentaries* § 1258; see also *Pliske v. Yuskis*, 83 Ill.App.3d 89, 95–96, 38 Ill.Dec. 479, 484, 403 N.E.2d 710, 715 (3d Dist.1980) (injunction against trespass proper where amounts recoverable at law are disproportionately small compared with expense of suit)). In particular here, Huskey's knowledge that NBC has the film and may tele-

---

18. That was a large extent indeed; see 400 Ill. at 43–45, 79 N.E.2d at 49–50.

**1296**

cast it at any future time at least suggests the possibility of irreparable harm.

 It is no answer for NBC to tell Huskey to wait for a telecast and then sue for damages. So long as NBC has the film in its files, Huskey is forced to wonder when NBC will pull it out and put it on the air, adding the anguish of that uncertainty to whatever he may already have suffered. There is no reason why his fears should not be put to rest.

One point should not be lost sight of in all the just-completed discussion of the injunctive remedy. NBC's position equates to a motion to strike Huskey's prayer for injunctive relief. This Court's denial of that motion should not be misunderstood as a decision confirming the actual availability of injunctive relief here. This opinion holds only that injunctive relief is not necessarily *im* proper. Only a future evidentiary showing will demonstrate whether or not such relief is appropriate in fact.

*Conclusion*

NBC's motion is denied. NBC is ordered to answer the Complaint on or before April 23, 1986.