FRANCIS R. MAERE *et al.,* Plaintiffs-Appellants, *v.* CYRUS CHURCHILL *et al.,* Defendants-Appellees.

Third District   No. 82—245

Opinion filed July 27, 1983.

Stephen W. Newport, of Newport & Buzzell, of Davenport, Iowa, for appellants.

Stuart R. Lefstein and Linda E. Frischmeyer, both of Katz, McAndrews, Durkee, Balch & Lefstein, of Rock Island, for appellees.

JUSTICE ALLOY delivered the opinion of the court:

The plaintiffs Francis Maere and Joann Maere, husband and wife, appeal from judgments of the circuit court in their action against defendants Cyrus Churchill and Daniel Churchill, individually and as partners in the law firm of Churchill & Churchill. The Maere's action was brought against the Churchills to recover damages caused by an alleged breach of an oral contract to provide legal services and by alleged negligence in the performance of services to the Maeres in a real estate purchase transaction. The circuit court, on defense motion to strike, ruled that the Maeres could not recover, in this action, for damages resulting in mental anguish, emotional distress, disappointment and inconvenience. From the striking of these alleged damages, the Maeres now appeal, arguing that such damages are recoverable. The Maeres also appeal from the decision of the circuit court disallow-

ing their filing of a late jury demand. On the merits, the court denied the Maeres' motion for partial summary judgment, on the question of liability, and granted the Churchills' motion for summary judgment against the Maeres. From both of these rulings, the Maeres now appeal.

The record reveals the following undisputed pertinent facts before the court in conjunction with the parties' motion for summary judgment. On April 24, 1977, the Maeres entered into a real estate purchase contract for Lots 20A and 21A in "Arcadia," a subdivision of Moline, Illinois. The sellers under the contract were Roderick and Marlene Saelens. Subsequent to the execution of the purchase contract, the Maeres entered into an oral agreement with Cyrus Churchill, of the law firm of Churchill & Churchill, to retain the firm for the purpose of reviewing the abstracts of title and rendering a certificate of title. They were retained to represent the Maeres in connection with the closing of the real estate transaction, effecting a transfer of the property from the sellers, in accordance with the contract terms. Defendant Cyrus Churchill examined the abstracts of title on the properties, and the transfer was made by warranty deed, dated July 14, 1977. The certificate of title was issued by the defendants on September 24, 1977, indicating that the Maeres had merchantable title, in fee simple, to Lots 20A and 21A.

In the fall of 1978, almost a year later, the Maeres proceeded with their plans to build on the lots in question, receiving bids from various subcontractors. In the course of their progress towards construction, the Maeres obtained information from a variety of sources concerning certain restrictive covenants pertaining to Lots 20A and 21A. These covenants, contained in the plat for Arcadia Subdivision, provided in substance that the "A" lots of the subdivision were to be considered a part of the lots of like number and were to be conveyed with such like numbered lots. The plat also restricted improvements on the lots, prohibiting any buildings on "A" lots. Concerned about possible obstacles to their planned construction, the Maeres contacted the Churchill firm to discuss the problem. This was in January 1979, and at that time, Cyrus Churchill informed Mr. Maere that if they, the Maeres, would come to his office, a policy of title insurance could be obtained to take care of any problem that might exist. The Maeres did not follow up the offer of title insurance, and instead contacted other counsel in regard to their problems.

In March or April, 1979, independent counsel for the Maeres contacted the Churchills about the problems, explaining the nature of the restrictive covenants and requesting that the Churchills cure the diffi-

culties arising due to their existence. The Churchills, in response, obtained a commitment from an agent for Chicago Title Insurance, indicating that the restrictions were insurable and that his company would insure them. The Churchills' position, at that time, was that the restrictions were void, as contrary to public policy, and were not a defect in title. However, in an attempt to settle the matter and put the Maeres' concerns to rest, they agreed to obtain the title insurance. In any event, on July 23, 1979, the Churchills paid for and obtained a formal commitment for title insurance, which was in the amount of the purchase price of the lots, or $10,500. By endorsement, Chicago Title specifically agreed to insure over the alleged defects, being the restrictive covenants above noted. The policy, as written, was not acceptable to the Maeres.

In September 1979, without having resolved the question of title, or the dispute with the Churchills, the Maeres applied for a construction loan, with Union Federal Savings and Loan Association, for the purpose of obtaining financing for construction of improvements on Lots 20A and 21A. The loan application was in the amount of $40,500, at 10.6% interest. They received a loan commitment from Union Federal for those figures. In processing, an attorney for Union Federal examined the abstracts of title for the lots in question, and he issued a preliminary report on title, dated October 22, 1979, in which the restrictive covenants above noted were set forth as encumbrances and title defects. Shortly thereafter, Union Federal informed the Maeres that those defects would have to be rectified before finalizing the construction loan. The Churchills were informed of these developments promptly, and on November 5, 1979, they tendered to Union Federal a title insurance policy, in the amount of the purchase price ($10,500), specifically insuring against the defects complained of, with an issue date of July 23, 1979. Union Federal, for purposes of finalizing the construction loan, however, required title insurance sufficient to cover the improvements which the plaintiffs intended to make on the properties. The issuing agent for the company had also agreed that such additional insurance would be available, upon request and payment of the premium. The record indicates that the attorney for Union Federal considered the form of the policy adequate, and he recommended that the loan application be processed, subject to receiving the additional insurance to protect the mortgage. The Maeres also understood that if they had paid the additional premium (later determined to be $300), their loan would have been approved and they could have proceeded with construction. However, neither the Maeres, nor the Churchills, would pay the additional premium to cover value

of improvements, and on or about November 22, 1979, the loan commitment was lost. That loan application with Union Federal was the only such application made by the Maeres in connection with their planned construction on Lots 20A and 21A.

Thereafter, unsuccessful negotiations continued between counsel for the Maeres and the Churchills in an attempt to resolve the matter. Finally, in July 1980, the Maeres filed their original complaint, without a jury demand. A first amended complaint was filed in August 1980, in which the Maeres asserted claims against the Churchills based upon breach of contract and negligence. Their claims sought compensatory damages and damages based upon their "great mental anguish, emotional distress, disappointment and inconvenience." The circuit court, pursuant to a defense motion to strike, found that the mental anguish damages were not recoverable in the action, and it ordered those portions of the amended complaint stricken.

The Maeres' third amended complaint was filed in March 1981, and discovery in the action proceeded. The case was set for jury trial, pursuant to the codefendants' (Saelens, the sellers) jury demand. Shortly before the scheduled trial date, the Saelens' attorney indicated to the Maeres' attorney that his clients were going to withdraw their jury demand. That same day, January 13, 1982, the Maeres filed a motion for leave to file a late jury demand. The following day the Saelens filed a withdrawal of their jury demand. The Churchills opposed any late jury demand by plaintiffs Maeres, and a hearing on that motion was held.

Both parties also filed motions for summary judgment, supported by deposition, affidavits and briefs. The Maeres sought entry of partial summary judgment, on the issue of liability, against the Churchills, and the Churchills sought summary judgment as against the Maeres. The court thereafter entered orders. It denied the request for the filing of a late jury demand, and it also granted the Churchills' motion for summary judgment. The Maeres' motion for summary judgment was denied. This appeal followed, with the Maeres contending that the court erred (1) in striking the damages for mental anguish, (2) in denying the request for filing of a late jury demand, (3) in denying their motion for partial summary judgment, and (4) in granting the Churchills' summary judgment. We turn then to the issues, and any disputed factual matters will be brought forth with our analysis, as pertinent.

■■ ■ The first issue raised is whether the trial court erred in striking the plaintiffs' damage claims for mental anguish and emotional distress, under both the contract and negligence theories. We

find no error. The general rule is that

"damages for mental anguish are limited to cases in which there has been a personal physical injury or where the defendant wilfully, wantonly, recklessly, or intentionally caused the mental anguish. Thus, recovery for mental anguish is not, as a general rule, allowed in actions for breach of contract; the courts evidently believe that the mental suffering which accompanies a breach of contract is too remote for compensation." (22 Am. Jur. 2d *Damages* sec. 195 (1965).)

In the contract area, damages for breach will not be given as compensation for mental suffering, except where the breach was wanton or reckless and caused bodily harm, or where the defendant had reason to know, when the contract was made, that its breach would cause mental suffering for reasons other than mere pecuniary loss. (Restatement of Contracts sec. 341, at 559 (1932).) As more succinctly stated in the Restatement (Second) of Contracts sec. 353, at 149 (1981):

"Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." (See also Annot., 61 A.L.R.3d 922 (1975); 38 Am. Jur. 2d *Fright, Shock, and Mental Disturbance* sec. 33 (1968).)

The plaintiffs' complaint herein does not allege that the defendants' breach of contract was intentional, reckless or wanton, nor are physical injuries alleged from the said breach. Furthermore, the contract at issue is for examination of abstracts of title to real estate and related services in connection with the real estate transaction. Even though real estate is unique and the attorney-client relationship is a fiduciary one, we are unable to conclude that serious emotional disturbance is a particularly likely result of an attorney's breach of contract in his examination of title to real estate. At least, on the allegations contained in plaintiffs' amended complaint, we conclude that such emotional disturbance was not set forth as a particularly likely result of any breach by defendants of their contract. The court did not err in striking allegations of mental anguish and emotional distress from the contract count of the first amended complaint.

Nor does the negligence count of the first amended complaint set forth a basis for recovery of damages for mental anguish and emotional distress. The long-standing rule in Illinois is that stated in *Braun v. Craven* (1898), 175 Ill. 401, 51 N.E. 657, barring recovery, under a negligence theory, for emotional distress where there has been no accompanying physical impact. (See also *Harkcom v. East*

*Texas Motor Freight Lines, Inc.* (1982), 104 Ill. App. 3d 780, 433 N.E.2d 291.) This doctrine, termed the impact rule, has been modified recently by the Illinois Supreme Court in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546. There, the court adopted what has been described as the zone-of-physical-danger rule.

> "Basically, under it a bystander who is in a zone of physical danger and who, because of the defendant's negligence and as a consequence of it, has reasonable fear for his own safety has a right of action for physical injury or illness resulting from emotional distress." 98 Ill. 2d 546, 555.

This change in the law is not broad enough, however, to permit recovery to plaintiff herein, where the emotional distress is premised solely upon alleged negligence of the defendants in performing legal work for the plaintiffs. The trial court properly struck those portions of the complaint wherein plaintiffs sought recovery for alleged emotional distress.

The next issue on appeal is whether the trial court correctly entered summary judgment in favor of the defendants Churchill. The parties concede that the basis for summary judgment in defendants' favor was the court's conclusion that any damages suffered by the Maeres were the result of their own inaction, and not the result of the Churchills' breach of contract or negligence. Pertinent hereto is the evidence in the record that the Maeres were offered, but refused, title insurance covering the alleged defects in title. The Maeres contend that the damages they suffered were not the result of their inaction, but the result of the failure of the Churchills to satisfactorily fulfill their contract. The Churchills argue that the trial court was correct in its conclusion as to the absence of damages caused by them, and contend that even assuming liability, *arguendo,* the court properly gave judgment in their favor because of the lack of any damages specifically resulting from their conduct.

The defense places great emphasis upon their offer, and ultimate tender, of a title insurance policy covering the objected-to restrictions, and upon their arranging for further insurance, to cover the costs of improvements, provided such was requested and paid for by the Maeres. It is not disputed that Cyrus Churchill made a general offer to take care of the problems, in January 1979, when they first were brought to his attention, through the purchase of title insurance. Nor is it disputed that the Churchills offered a title policy, specifically insuring against the defects complained of by the Maeres and Union Federal, in April 1979, with the amount that of the purchase price. A commitment for such a policy was later obtained and sent to the

Maeres' counsel in August. There is no dispute that the title company was willing to insure the improvements on the lots, under that policy, provided that a request for such was made and that a premium was paid. Such a policy, along with the availability of further insurance for the improvements, was available to the Maeres in the fall of 1979, prior to the time the loan was lost. The record also clearly establishes that the attorney for Union Federal, the lender, considered the form of the policy offered acceptable, and he recommended that the loan be processed, subject to receiving the additional insurance to protect the mortgage. The Maeres chose not to accept the policy offered, nor to purchase the additional insurance coverage for the improvements. They felt such additional premium cost, covering the improvements, was not their obligation, but that of the Churchills.

■■■ Illinois has long recognized the applicability, in questions of damages, of the doctrine of avoidable consequences, which prevents a party from recovering damages for consequences which that party could reasonably have avoided. This doctrine has been set forth on a number of occasions by the Illinois Supreme Court.

> "Sutherland, in his work on Damages, says (sec. 88): 'The law imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertions to render the injury as light as possible. If by his negligence or willfulness he allows the damages to be unnecessarily enhanced, the increased loss, —that which was avoidable by the performance of his duty, —falls upon him. This is a practical duty under a great variety of circumstances, and as the damages which are suffered by a failure to perform it are not recoverable, it is a duty of great importance. ***' " (*Cedar Rapids & Iowa City Ry. & Light Co. v. Sprague Electric Co.* (1917), 280 Ill. 386, 391.)
>
> " 'The principle of ' "avoidable consequences" ' upon which the reduction of damages rule is grounded is not confined entirely to the narrow limits suggested by the appellant. It finds its application in virtually every type of case in which the recovery of a money judgment or award is authorized. (Sedgwick on Damages, 9th ed., sec. 204, p. 390; 15 Am. Jur., sec. 27, p. 420; 25 C.J.S., Damages, sec. 33, p. 499.) It addresses itself to the equity of the law that a plaintiff should not recover for those consequences of defendant's act which were readily avoidable by the plaintiff. Sutherland on Damages, (1844) vol. 1, p. 226, et seq.' " (*Kelly v. Chicago Park District* (1951), 409 Ill. 91, 98, 98 N.E.2d 738, quoting with approval from *State ex rel.*

*Dresskell* (Fla. 1943), 13 So. 2d 707.)

Illinois appellate courts have also discussed the doctrine and applied it in a variety of cases:

> "The general rule is that it is the duty of a party injured by a breach of contract or tort to make a reasonable effort to avoid damages therefrom, and such damages as might by reasonable diligence on his part have been avoided are not to be regarded as the natural and probable result of plaintiff's acts, and therefore there can be no recovery for damages which might have been avoided by reasonable effort on the part of the person injured." (*Nelson v. Buick Motor Co.* (1913), 183 Ill. App. 323, 325 (breach of contract). See also *Panteles v. Arsht* (1923), 227 Ill. App. 488, 491; 22 Am. Jur. 2d *Damages* sec. 30 (1965); Restatement (Second) of Torts sec. 918 (1979).)

We find the rule of "avoidable consequences" to have application in the instant case, for the evidence before the court establishes that the Maeres could have obtained the construction loan, and thereby proceeded with construction as planned, in November 1979, provided (1) that they had accepted the defendants' tender of the title policy, in the amount of the purchase price and specifically covering the alleged defects, and (2) that they had requested the available additional coverage for the improvements and been willing to pay the additional premium for the coverage. There is no dispute that the additional premium was a small amount, later set at $300, which was well within the financial capabilities of the Maeres at that time. Mrs. Maere admitted in her deposition testimony that had they agreed to pay the additional premium for the improvements coverage, they would have received the loan from Union Federal. Corroboration for this is also found in the statement, by affidavit, from Union Federal's attorney. Application of the rule of avoidable consequences, in these circumstances results in a conclusion that the loss of the construction loan, and further damages resulting from and occurring after such loss, could have been avoided, if the Maeres had agreed to accept the title insurance and had agreed to pay the additional premium. The amount of the additional premium was not great, especially in light of the benefit to them of securing the loan on the favorable terms available at that time. Having failed to avail themselves of a clear opportunity, arranged by the defendants, to minimize their damages, they are barred from seeking damages as against the defendants, which could have been avoided by such action. Thus, any damages resulting from the loss of the construction loan are not recoverable by the Maeres, and this includes the asserted costs of financing, at a higher rate of

interest, for a similar loan at a later date. It also includes damages based upon the value of the property to them, with and without the restrictions, for the restrictions would have had no effect upon their intended plans to build, had they arranged for title insurance in November 1979, when it was available.

The Maeres assert other damages as well as the above, however. They seek recovery for lost profits which they assert would have been theirs from the construction project. They assert that the project would have been completed by June of 1979, if the defendants had not breached their contract and been negligent in the performance of the services they rendered. Plaintiffs also assert damages resulting from the delay in obtaining the construction loan, which delay is alleged to have been caused by the defendants Churchills' failure to rectify their mistakes. The facts in the record, however, indicate that no loan application was made by the Maeres until September 1979, and such application was accepted and approved, with the conditions above stated concerning title insurance. The decision as to when to apply for the construction loan, whether January or September, was the plaintiffs' decision to make, and they cannot charge the defendant for damages resulting from their delay in making application for the loan. Additionally, it is instructive to examine the position the plaintiffs would have been in had the Churchills done what the plaintiffs assert should have been done.

■■ The Maeres contend that had the Churchills brought the restrictions to their attention before closing, and it is the failure to do so which forms the basis for the breach of contract and negligence actions, then, in that event the sellers would have been required to cure the defects. However, under the terms of the contract for sale, which contract had been proferred by the Maeres, the sellers had an option with respect to furnishing satisfactory evidence of title. Under paragraph 1 of that contract, the sellers could have provided a policy of title insurance, *in the amount of the purchase price,* in fulfillment of their obligation to furnish purchasers with satisfactory evidence of title. Since the contract would have to be construed against the Maeres, as makers, under accepted contract construction rules, the sellers would have been able to solve any problem by providing a title policy, in the amount of the purchase price, specifically covering the complained-of defects in title. (See, *e.g., Dolan v. Hudson* (1968), 83 S.D. 144, 155, 156 N.W.2d 78, 84-85.) Thus, had the Churchills performed as they are alleged to have been required to do, the Maeres would have, in all probability, obtained from the sellers a title policy, in the amount of the purchase price, specifically covering the ob-

jected-to restrictive covenants. As already noted, the record indicates that a title policy, covering the problems was offered by Cyrus Churchill in January 1979, when the matter was first brought to his attention, and a policy commitment, in the amount of the purchase price, specifically covering the defects complained of, was obtained and proferred in the spring of 1979 to the Maeres by the Churchills. Having been offered what was essentially the full benefit of performance under the contract, and having refused it, they may not now seek damages for costs incurred by them which would have not been incurred, if they had not refused the Churchills' offer. The record shows that if the Maeres had accepted the offer of title insurance at the outset of their dispute with the Churchills, they would have put themselves in the same situation and position as they would have been in, had the Churchills done what is alleged to have been required of them under the oral contract for legal services. Therefore, we agree with the trial court that all of the damages alleged to have been incurred by the plaintiffs were avoidable by them through the acceptance of the title insurance policies and arrangements obtained by the Churchills. Since a plaintiff in a legal malpractice action has the burden of proving damages, as an element of his cause of action (*Connaughton v. Gertz* (1981), 94 Ill. App. 3d 265, 271, 418 N.E.2d 858; *Gillion v. Tieman* (1980), 86 Ill. App. 3d 147, 150, 407 N.E.2d 1146), and the record herein indicates that the damages allegedly suffered by the plaintiffs Maere could have been avoided by them through acceptance of the proferred title insurance, therefore the plaintiffs failed to establish damages attributable to the defendants, and the defense was entitled to summary judgment on that basis.

Since we have determined that the trial court correctly entered summary judgment in favor of the Churchills, on the basis of the lack of damages, we need not reach the issues as to the denial of the partial summary judgment for plaintiffs, or the denial of the request to permit filing of a late jury demand.

For the reasons stated above, the decision of the circuit court in this matter is affirmed.

Affirmed.

HEIPLE and STOUDER, JJ., concur.