2020 IL App (2d) 190840
No. 2-19-0840
Opinion filed September 29, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JUDITH MAYSTER and SCARAMOUCHE ENTERPRISES, LLC, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 17-L-655 |
| J. STEVE SANTACRUZ and SCHOOLHOUSE 4 MATH, LLC, | ) ) ) ) | |
| Defendants | ) ) | |
| (Scaramouche Enterprises, LLC, Plaintiff-Appellant and Cross-Appellee; Schoolhouse 4 Math, LLC, Defendant-Appellee and Cross-Appellant.) | ) ) ) ) ) | Honorable Michael J. Fusz, Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hudson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1 This breach-of-contract action involves the purchase and sale of a Mathnasium math tutoring franchise. After a bench trial, the trial court found that defendant, Schoolhouse 4 Math, LLC (Math), wrongfully terminated the purchase contract but that plaintiff, Scaramouche Enterprises, LLC (Scaramouche), was precluded from collecting damages, because of its complete failure to mitigate its losses. Scaramouche appeals. Though Math prevailed below, Math cross-

appealed, challenging one of the trial court's findings. As we discuss below, Math withdrew the cross-appeal at oral argument. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3 Before trial, the court dismissed the individuals, plaintiff Judith Mayster and defendant J. Steve Santacruz, from the litigation. At trial, the evidence showed the following. Mayster formed Scaramouche to purchase and operate two Mathnasium franchises, Mathnasium of Grayslake (Grayslake) and Mathnasium of Barrington (Barrington). In December 2015, Mayster decided to sell the businesses. She listed Grayslake for $90,000, but she sold it back to the franchisor for approximately $15,000. Pursuant to the buy-back agreement, Grayslake's financial status remained confidential. Mayster listed Barrington for $150,000. She later reduced the price to $130,000.

¶ 4 Santacruz manages Math, which owns seven Mathnasium franchises. In September 2016, Santacruz and Mayster began discussions for Math to purchase Barrington. They agreed upon a purchase price of $100,000. Math would also assume Barrington's property and copier leases. Math terminated the contract after the Illinois Department of Revenue (Department) issued a bulk-sales stop order requiring Math to withhold almost $13,000 in taxes from the purchase price at closing.[1] Math then offered to reinstate the contract and purchase Barrington at the same price. When Mayster, as Scaramouche's manager, demanded 100% of the purchase price in cash at closing as a condition of reinstatement, Math's attempt to reinstate the contract was aborted. This litigation began when Mayster sued Santacruz individually over allegedly defamatory letters that

---

[1] Upon the sale of a business, the Department can order the purchaser to withhold an amount to cover any liability for tax, penalty, and interest due from the seller. 86 Ill. Adm. Code 130.1701 (2007).

Santacruz wrote, voicing his perception that Mayster had failed to pay taxes. The defamation counts of the lawsuit were dismissed with prejudice and are not at issue in this appeal.

¶ 5 Before the dismissal of the defamation counts, Scaramouche and Math were added to the lawsuit. Scaramouche claimed $100,000 in damages for breach of contract plus consequential damages of approximately $11,000 for the lease payments that Math failed to assume. Math raised the affirmative defense that Scaramouche failed to mitigate its damages.

¶ 6 At trial, which occurred on June 4 to June 7, 2019, Mayster testified as follows. In June 2017, the parties entered into a letter of intent (LOI), which outlined the terms of the proposed transaction. Pursuant to the LOI, Math had 30 days to complete a due diligence review of Barrington's financial, accounting, and business records. Mayster provided certain documents in response to Santacruz's due diligence request. However, that response did not include balance sheets. Mayster testified that the balance sheets contained combined financial information for Barrington and Grayslake. When Santacruz did not object to the nondisclosure of the balance sheets, Mayster assumed that he agreed not to pursue the matter.

¶ 7 On June 29, 2017, the parties signed an asset purchase agreement (APA). The APA contained a representation that Mayster had provided the balance sheets. She knew that the representation was not accurate, but she assumed that "everything was done that had to be done." In July 2017, Santacruz met Mayster at Barrington, where she gave him additional documentation pertaining to the business. Santacruz did not mention the balance sheets.

¶ 8 Mayster next heard from Santacruz after the issuance of the bulk-sales stop order. Mayster was confused by the Department's action, as her taxes were paid. Mayster's attorney explained to Santacruz that the Department was demanding payment of future taxes, and then "everything seemed to settle." Mayster's attorney was to prepare the closing documents, Santacruz asked for

wiring instructions, and Mayster assumed that the transaction would close. However, the closing did not occur, because of the "tax situation."

¶ 9    In an attempt "to resurrect the deal," Santacruz demanded that Mayster pay for an asset lien search. At first, Mayster refused to have a search conducted, because the APA did not require it. Later, Mayster agreed to an asset lien search if Santacruz paid for it. He refused. Mayster also agreed to provide Barrington's balance sheets, but Santacruz wanted the information pertaining to Grayslake as well. In the end, efforts to renegotiate the contract failed.

¶ 10 Mayster relisted Barrington for sale at $130,000. She obtained the names of an interested couple through the franchisor, and her attorney contacted three current franchise owners who expressed interest. However, the "opportunity" to sell Barrington did not arise. In January 2018, Mayster decided to close the business rather than lower the asking price. Mayster testified that the business was not profitable, she was unable to  keep up with both her full-time job and Barrington, and she "just didn't want to put any more money into it." She voluntarily closed Barrington in February 2018.

¶ 11 On cross-examination, Mayster agreed that, after Santacruz terminated the contract, he "almost immediately" reached out to "get the deal back on track." Mayster also agreed that she would close on the transaction only if Santacruz paid the full purchase price at closing, instead of adhering to the APA's pricing structure. Mayster did not sign Santacruz's proposed reinstatement agreement, but instead she filed suit against Santacruz for defamation.

¶ 12 Mayster testified that she listed Barrington on BizBuySell, which was a public listing not targeted to potential franchise buyers. When the franchisor suggested that Mayster advertise the sale of Barrington in an internal publication called "Mathnasium Matters," which targeted Mathnasium owners, Mayster declined. She informed the franchisor that she intended to close the

business. Mayster testified that she was also concerned that the tutors would find other jobs if they found out that she was trying to sell or close the business, which would leave her students stranded. Mayster agreed that she did not consider reducing the asking price from $130,000, even though she had no offers to purchase Barrington. She also denied that the franchisor suggested that the purchase price be linked to the number of students.

¶ 13 Attorney Lauren LoMonaco, who represented Mayster in the sale of Barrington, testified next on behalf of Scaramouche. LoMonaco testified that the APA was the entire agreement of the parties. LoMonaco had conversations with Santacruz in which he "didn't really care so much about updated balance sheets" as he cared about incoming student contracts and revenue from student enrollment. LoMonaco testified that, after she explained the meaning of the bulk-sales stop order to Santacruz, he asked LoMonaco for the closing documents. He also asked Mayster for wiring instructions, which led LoMonaco to believe that he was ready to close the transaction. However, Santacruz then demanded an asset lien search, in the absence of which he threatened to terminate the contract. Next, LoMonaco received a termination letter. LoMonaco testified that Santacruz was "unhappy" about the bulk-sales stop order. He did not mention the balance sheets in his termination letter.

¶ 14 On cross-examination, LoMonaco testified that she and Mayster would have cooperated with an asset lien search if Santacruz had agreed to pay for it. LoMonaco agreed that she received e-mails in June 2017 in which Santacruz was asking for the balance sheets. LoMonaco testified that the Grayslake information was confidential but that she learned from Mayster's accountant that the Grayslake information could be separated from the Barrington information.

¶ 15   LoMonaco testified that two days after Santacruz terminated the contract, he was willing to reinstate it. His terms were that Mayster produce the balance sheets, conduct an asset lien search,

and extend the closing date. Mayster responded that Santacruz would have to pay for the lien search, she would not extend the closing date, and Santacruz would have to pay the full purchase price in cash at closing. Santacruz rejected that proposal.

¶ 16 On redirect examination, LoMonaco testified that the APA did not require Mayster to produce documents and that the due diligence period under the LOI ended before the APA was signed. Because LoMonaco received Santacruz's termination letter, which convinced her that the "deal was dead," she did not follow up with the accountant's suggestion to separate the Grayslake and Barrington balance sheets. With that testimony, Scaramouche rested.

¶ 17 After the court denied Math's motion for a directed finding, Santacruz testified on behalf of Math. Santacruz testified that he wanted to close on August 31, 2017, but Mayster insisted on closing on July 31, 2017, because she was going to retire. Rather than conduct due diligence in a short amount of time, Santacruz concentrated on getting "an asset purchase agreement in place." Santacruz testified that receiving the balance sheets was critical to him. He knew that Mayster's businesses were struggling, so he wanted a provision in the APA for disclosure of the balance sheets.

¶ 18 According to Santacruz, he had engaged in discussions with Mayster when she first listed Barrington, because he was "determined to have Barrington in my portfolio." However, he considered her asking prices of $150,000 and then $130,000 "way off reality." Santacruz testified that the franchisor recommended pricing a failing business at $1000 for every student. Barrington had 65 to 70 students. Santacruz testified that he told Mayster that Barrington was worth $65,000 to $75,000. Nevertheless, Santacruz offered to purchase Barrington for $100,000 because he knew that the Barrington market could be lucrative.

¶ 19 Santacruz testified that he assumed early on that the balance sheets would be "forthcoming." He was not concerned then that Mayster would refuse to produce them. According to Santacruz, he asked Mayster about the balance sheets when he visited Barrington in July 2017, and she told him that they had not yet been separated. Santacruz denied ever speaking to LoMonaco about the balance sheets. He testified that he never told LoMonaco that he did not want or need the balance sheets.

¶ 20 Santacruz testified that he became "alarmed" about Barrington's financial health when he received the bulk-sales stop order, which he interpreted to mean that Mayster's taxes were delinquent. He testified that the missing balance sheets "started raising hairs on the back of my neck." Santacruz then demanded "financial statements," which he said meant the balance sheets. He also demanded an asset lien search. Even though Santacruz considered the bulk-sales stop order to be a violation of the APA, he "was moving forward" toward the closing. However, when Santacruz's concerns were not allayed, he terminated the contract on July 24, 2017. Then, he told another of Mayster's lawyers, Diana Taylor, that they were in a "ridiculous situation," threatening litigation against each other, when "we should be putting this deal together." Santacruz offered to reinstate the APA with three additional conditions: (1) an asset lien search, (2) production of the balance sheets, and (3) an extension of the closing date to August 31, 2017. According to Santacruz, Mayster eventually agreed to all three of his demands, but she rejected his proposed reinstatement agreement. Mayster "changed the economic terms of the transaction" to "an all cash deal." According to Santacruz, "the deal died in August 2017."

¶ 21 Santacruz testified that he was currently in the process of selling a Mathnasium franchise. He listed it in Mathnasium Matters and on BizBuySell. In Santacruz's experience, Mathnasium Matters generated more substantial leads. Math then rested.

¶ 22 The court made the following findings. Santacruz was less credible than Mayster and LoMonaco. The LOI merged into the APA. Only the LOI contained a due-diligence clause. The APA did not require Mayster to produce any documents. Santacruz should have, but did not, request the balance sheets before he signed the APA. Santacruz's assumption that the balance sheets would be forthcoming, when Mayster produced everything except the balance sheets, was unreasonable. According to Santacruz's e-mails after the Department issued the bulk-sales stop order, his main concern was the taxes, not the balance sheets. Also, Santacruz's termination letter cited only Mayster's nondisclosure of "outstanding and unpaid taxes." The court concluded that Santacruz terminated the transaction based on his "increasing uncertainty as to the financial status of the company." Mayster's nonproduction of the balance sheets was not material to Santacruz's decision to terminate the contract, nor was their production required under the APA. Consequently, "any breach" by Scaramouche was not material and did not justify termination of the contract.

¶ 23 The court then stated: "We get to the issue of mitigation of damages." The court found that Scaramouche had a duty to mitigate its damages. In that vein, the court found as follows. Santacruz was still interested in buying Barrington after he terminated the contract, and he was still "willing to negotiate." If Mayster could have sold Barrington for $100,000 or less, Scaramouche would have mitigated its damages. Mayster, however, increased the selling price to $130,000 after the breach, and she refused to list it with Mathnasium Matters, which was "more likely" to produce a buyer than BizBuySell. Increasing the price to $130,000 after the termination was not a reasonable attempt to mitigate its damages. Consequently, the court found "no damages attributable to" Math's breach of the contract. The court entered judgment in favor of Math on its affirmative defense that Scaramouche failed to mitigate damages.

¶ 24 Scaramouche filed a motion to reconsider, arguing that Math presented no evidence as to which of Scaramouche's losses were avoidable and that Scaramouche acted reasonably in attempting to mitigate damages. In denying the motion to reconsider, the court noted that Mayster increasing her asking price 30% over the contract price after the breach was an "absolute failure to mitigate." The court stated that it was not incumbent upon Math to prove at what price Mayster could have sold Barrington after the breach because Mayster's failure to make any reasonable efforts to mitigate its damages precluded the award of any damages. Scaramouche filed a timely notice of appeal. Math filed a timely notice of cross-appeal.

¶ 25                                    II. ANALYSIS

¶ 26                              A. Math's Cross-Appeal

¶ 27 Math appealed the trial court's finding that it breached the APA, and it asked us to reverse that finding. However, in its brief, Math conceded that the trial court granted judgment entirely in Math's favor on other grounds. At oral argument, Math formally withdrew the cross-appeal, recognizing that the forum of the appellate court is not afforded to successful litigants who do not agree with the reasons, conclusions, or findings below. *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983); *Chicago Tribune v. College of Du Page*, 2017 IL App (2d) 160274, ¶ 28. We note that a party cannot complain of error that does not prejudicially affect it, and one who has obtained by the trial court's judgment all that has been asked for cannot appeal from that judgment. *Material Service Corp.*, 98 Ill. 2d at 386; *Chicago Tribune*, 2017 IL App (2d) 160274, ¶ 28. Accordingly, Math's cross-appeal is withdrawn.

¶ 28                              B. Scaramouche's Appeal

¶ 29 Scaramouche argues that (1) the trial court erred in finding that it failed to mitigate its damages and (2) the trial court erroneously found that Scaramouche's failure to mitigate damages

was a bar to any recovery. Math contends that Scaramouche's complete failure to mitigate damages properly resulted in a 100% reduction of its damages.

¶ 30 Preliminarily, we comment on Math's brief. First, we note the ubiquitous use of footnotes to argue substantive matters and include substantive material that should have been presented in the body of its brief. It is within our discretion to strike such footnotes as violations of Illinois Supreme Court Rule 341(a) (eff. May 25, 2018), which discourages the use of footnotes. See *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d 214, 218 (2001) (appellate court struck footnotes that should have been integrated into the body of a reply brief). Second, we note the lavish use of a condensed, barely readable font to present excerpts from documents and e-mails. This is in violation of Rule 341(a), which requires 12-point typeface throughout the document, including "quoted material and any footnotes." Ill. S. Ct. R. 341(a) (eff. May 25, 2018). The rule explicitly provides that "[c]ondensed type is prohibited." Ill. S. Ct. R. 341(a) (May 25, 2018). It is clear to us that Math, in both the excessive use of single-spaced footnotes and the condensed type, violated the rule to fit more facts and arguments into a 50-page brief than it could have if it complied with the rule. It is within our authority to strike Math's brief based on this noncompliance. See *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005). However, striking a party's brief, in whole or in part, is a harsh sanction that is appropriate only when the violations hinder our review. *Gruby v. Department of Public Health*, 2015 IL App (2d) 140790, ¶ 12. Consequently, we decline to strike Math's brief, but we remind Math's counsel that failure to comply with the supreme court rules regarding appellate briefs is not an inconsequential matter. See *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7.

¶ 31 We turn to the merits. The measure of damages for a breach of contract is the amount that will compensate the aggrieved party for the loss that the breach entailed. *Santorini Cab Corp. v.*

*Banco Popular North America*, 2013 IL App (1st) 122070, ¶ 26. The purpose of damages is to put the nonbreaching party into the same position, but not a better position, as if the contract had been performed. *Santorini*, 2013 IL App (1st) 122070, ¶ 26. Where the contract pertains to something that is obtainable in the market, the measure of damages is the difference between the contract price and the fair market value at the time of the breach. *Santorini*, 2013 IL App (1st) 122070, ¶ 27. The general rule is that a person who is injured by a breach of contract must make a reasonable effort to avoid damages therefrom. *Maere v. Churchill*, 116 Ill. App. 3d 939, 947 (1983). The "doctrine of avoidable consequences" dictates that there can be no recovery for damages that might have been avoided by a reasonable effort on the part of the person injured. *Maere*, 116 Ill. App. 3d at 947. The failure to mitigate damages is an affirmative defense that must be pleaded and proved by the defendant. *Boyer v. Buol Properties*, 2014 IL App (1st) 132780, ¶ 67.

¶ 32    The parties disagree on the standard of review. Scaramouche argues that our review is *de novo*, as the matter involves undisputed facts and the only question is "whether the doctrine of mitigation of damages should apply." Math contends that the correct standard of review is whether the court's finding that Scaramouche failed to mitigate its damages was against the manifest weight of the evidence. We agree with Math. The issue of damages is a question of fact, and a trial court's finding of damages will not be disturbed unless it was against the manifest weight of the evidence. *Doornbos Heating & Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.*, 403 Ill. App. 3d 468, 485 (2010). A damages assessment is against the manifest weight of the evidence when the court ignored the evidence or used an incorrect measure of damages. *Morse v. Donati*, 2019 IL App (2d) 180328, ¶ 17.

¶ 33                1. Whether Scaramouche Failed to Mitigate Its Damages

¶ 34 The duty[2] to mitigate damages requires the injured party to exercise reasonable diligence and ordinary care to minimize its damages. *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 213. Here, the court found that Mayster acted unreasonably when she (1) listed Barrington for 30% more than the contract price following Math's breach, (2) never considered reducing the asking price, and (3) rejected the franchisor's advice to advertise the sale of Barrington in Mathnasium Matters, a publication targeted to persons interested in acquiring these particular franchises. The court also found that Santacruz was willing to negotiate a reinstatement of the APA after Math's termination and that, if Scaramouche could have sold Barrington for $100,000, it would have mitigated its damages.

¶ 35 Scaramouche argues that Mayster acted reasonably in increasing the asking price to $130,000, because that was the asking price when Santacruz agreed to purchase Barrington for $100,000. According to Scaramouche, the franchisor did not suggest that Mayster lower the price, and it notes that Mayster had previously received offers of $120,000 and $110,000 from other potential buyers. Scaramouche contends that the court failed to take into account that the listing price would not necessarily be the price at which Mayster would agree to sell. Scaramouche further asserts that Mayster's decision not to advertise in Mathnasium Matters was justified by her concern that her tutors would find other jobs. Thus, Scaramouche concludes, the court was "hypercritical" in finding that Mayster did not act reasonably. See *Holland*, 2013 IL App (5th) 110560, ¶ 213 (the duty to mitigate cannot be invoked as grounds for a hypercritical examination of the plaintiff's conduct).

¶ 36 Based on the evidence, we determine that the court was not hypercritical. As the court noted, Mayster had the obligation to sell Barrington "at whatever price she could." Raising the

---

[2] For a full discussion of this "duty," see *infra* ¶¶ 41-42.

price by 30% to profit from Math's abandonment of the APA was itself a breach of the duty to exercise reasonable diligence to mitigate damages. See *MBC, Inc. v. Space Center Minnesota, Inc.*, 177 Ill. App. 3d 226, 233-34 (1988) (landlord's failure to offer warehouses at same rent and terms after sublessee's breach constituted a breach of the duty to exercise reasonable diligence to mitigate damages). Moreover, while Mayster might have had offers above $100,000 before Santacruz's offer, none of those offers materialized into a sale. Mayster had no offers after she relisted Barrington for $130,000, which makes her refusal to reduce the price unreasonable. As the court noted, it is common sense that reducing the sales price would make it easier to sell.

¶ 37 Further, the court was entitled to discount Mayster's explanation for not advertising in Mathnasium Matters. Mayster testified that she was concerned that her tutors would learn that she was selling the business and that they would find other jobs, stranding the students. However, when Santacruz visited Barrington in July 2017, Mayster introduced him to an employee as the buyer. Consequently, at least one of her employees already knew that she was selling the business when the opportunity to advertise in Mathnasium Matters arose. Most telling is Mayster's reply in an e-mail to the franchisor's suggestion to post in Mathnasium Matters. Mayster wrote that she was "considering closing [Barrington] for several reasons." Among those reasons, Mayster listed her commitment to her full-time job, "[which] is much more than a regular work week," and being "67 years old and adding the hours to continue [Barrington] is more than I can physically keep up with." Mayster added: "Obviously I would really rather sell than close[,] but I just cannot keep up the pace to wait another year or however long it takes ***." While this court sympathizes with Mayster's plight, she is not entitled to have Math pay for her voluntary decision to close the business. Accordingly, we cannot say that the court's finding that Scaramouche made no reasonable efforts to mitigate its damages was against the manifest weight of the evidence.

¶ 38 2. Whether the Trial Court Misapplied the Doctrine of Avoidable Consequences

¶ 39 Scaramouche argues that the court erred in finding that its failure to mitigate its damages barred any recovery. Scaramouche asserts that Math had to produce evidence of the difference between the contract price and the amount for which Barrington would have sold to prove its affirmative defense. Math responds that the court found that 100% of Scaramouche's damages were avoidable and correctly found in Math's favor.

¶ 40 Illinois has long recognized the doctrine of avoidable consequences. *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 61. In the breach-of-contract context, a plaintiff cannot recover losses that could reasonably have been avoided. *Crawford v. Belhaven Realty LLC*, 2018 IL App (1st) 170731, ¶ 49. Scaramouche argues that, because its damages would only be *diminished* by any amount that could have been avoided (see *Med+Plus Neck & Back Pain Center, S.C. v. Noffsinger*, 311 Ill. App. 3d 853, 857 (2000)), and Math did not prove by how much those damages would be diminished, the court erred in entering judgment for Math. In other words, even assuming the failure to mitigate, Scaramouche presumes that its damages cannot be reduced to zero.

¶ 41 We take this opportunity to clarify the doctrine of avoidable consequences. The injured party incurs no liability to the breaching party by failing to take appropriate steps to mitigate its damages. *St. George Chicago, Inc. v. George J. Murges & Associates, Ltd.*, 296 Ill. App. 3d 285, 293 (1998); 3 Edward A. Farnsworth, Farnsworth on Contracts § 12.12 (3d ed. 2004). Put another way, the law does not assess damages against a plaintiff who fails to mitigate, it just "fails to compensate him for any injury he reasonably could have avoided." *Wired Music, Inc. v. Clark*, 26 Ill. App. 2d 413, 416 (1960). Thus, it is "misleading" to say that the aggrieved party has a "duty" to mitigate damages. *St. George*, 296 Ill. App. 3d at 293. Rather, the injured party is merely

precluded from recovering damages for losses that it could have avoided had it taken such steps. 3 Edward A. Farnsworth, Farnsworth on Contracts § 12.12 (3d ed. 2004). The party asserting failure to mitigate damages bears the burden of proof as to the extent of nonmitigation. *Washington Courte Condominium Ass'n-Four v. Washington Golf-Corp.*, 267 Ill. App. 3d 790, 822 (1994).

¶ 42 This view is consistent with the Restatement (Second) of Contracts § 350 (1981). *St. George*, 296 Ill. App. 3d at 293. However, the injured party is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss. Restatement (Second) of Contracts § 350, cmt. b (1981). So, whether or not we couch it as a "duty" to mitigate damages, the doctrine of avoidable consequences operates to deprive a plaintiff of recovery "for those consequences of defendant's act which were readily avoidable by the plaintiff." *Kelly v. Chicago Park District*, 409 Ill. 91, 98 (1951). Illinois Pattern Jury Instructions, Civil, No. 33.02 (approved Dec. 8, 2011) instructs that "[d]amages proximately caused by a failure to exercise [ordinary care to minimize existing damages] cannot be recovered." Thus, if 100% of Scaramouche's loss was proximately caused by Scaramouche's failure to mitigate its damages, Scaramouche's damages would not be recoverable. As a practical matter, whether a court reduces the plaintiffs' damages to zero, or bars them, the result is the same. See *Maere*, 116 Ill. App. 3d at 947 (as all the plaintiffs' damages were caused by their own inaction and could have been avoided, those damages were not recoverable, and the plaintiffs were "barred" from seeking those damages from the defendants).

¶ 43 Scaramouche sweeps aside that Mayster could have sold Barrington to Math for $100,000 immediately after Math terminated the APA, thus avoiding 100% of its damages. The documentary evidence supports Math's contention that Mayster unreasonably rejected Santacruz's attempts to reinstate the purchase. On July 26, 2017, two days after he terminated the APA, Santacruz offered to go forward with the purchase if Mayster provided an asset lien search at Barrington's expense,

produced the balance sheets, and extended the closing date one month. On July 28, Mayster rejected each of these proposals. On July 31, Santacruz sent Mayster a proposed reinstatement agreement, which provided for the $100,000 purchase price. The proposed reinstatement agreement also provided that Mayster would produce the balance sheets, Santacruz would place the amount of the bulk-sales stop order in escrow, and Mayster would continue business operations until the closing. On August 2, Mayster agreed to an asset lien search at Santacruz's expense, to produce Barrington's balance sheets, and to extend the closing date. In addition, Mayster wanted a written retraction of statements Santacruz had made concerning her nonpayment of taxes. On August 3, Santacruz wrote that he was "committed" to going forward with the transaction. He agreed to retract his statements, but he demanded that Mayster pay for the asset lien search, and he demanded the Grayslake balance sheets as well as Barrington's. Mayster replied that her "offer remained the same." Santacruz immediately inquired about Mayster's position with respect to continuing business operations. On August 9, Mayster agreed to "reinstate the contract," but she required the entire purchase price to be paid at closing on August 31. Santacruz rejected the new economic demand, but he again indicated his desire to purchase Barrington, and he sent another proposed reinstatement agreement, to which Mayster never responded.

¶ 44 Scaramouche relies on *Danada Square, LLC v. KFC National Management Co.*, 392 Ill. App. 3d 598 (2009), although that case supports Math's contention. In *Danada Square*, the defendant-lessee, which breached a retail lease, was ready, willing, and able to enter into a comparable lease. *Danada Square*, 392 Ill. App. 3d at 609. The plaintiff-lessor refused unless the substitute lease contained a provision that the plaintiff could retake the property on 60 days' notice, as it wanted to explore more profitable opportunities. *Danada Square*, 392 Ill. App. 3d at 609. The defendant was unwilling to accept such a provision. *Danada Square*, 392 Ill. App. 3d at 609. This

court held that the plaintiff could have avoided all its lost rent and reletting costs by accepting the defendant's offer. *Danada Square*, 392 Ill. App. 3d at 609. In other words, the plaintiff was bound to accept that offer without conditions to avoid the consequences of the defendant's breach. Here, as soon as Math terminated the APA, Santacruz offered to reinstate it. Instead of accepting that offer, Mayster attached the condition that Santacruz pay the entire purchase price at closing. Immediately after the attempt to reinstate the APA failed, Mayster listed Barrington at 30% above the APA contract price. Like the plaintiff in *Danada Square*, she wanted to explore more profitable opportunities. However, in so doing, she failed to avoid the consequences of Math's breach.

¶ 45 Scaramouche also relies on *Coffey v. DSW Shoe Warehouse, Inc.*, 145 F. Supp. 3d 771 (N.D. Ill. 2015). The issue in *Coffey* was whether the plaintiff, who was wrongfully fired from employment under a federal statute, mitigated her damages. *Coffey*, 145 F. Supp. 3d at 778. We question the relevance of a federal wrongful termination case that involved a presumption that the plaintiff was reasonably diligent in conducting a job search. See *Coffey*, 145 F. Supp. 3d at 779. In *Coffey*, the district court found that the defendant failed to rebut the presumption by presenting evidence from a potential employer that a job application by the plaintiff would have resulted in an offer. *Coffey*, 145 F. Supp. 3d at 779. Scaramouche argues that "here, [as in *Coffey*,] there is no evidence as to a point in time, or an act or inaction by Mayster, that would have offered a different alternative." As discussed at length, two days after Math terminated the APA, Math offered to reinstate it. That is when Mayster was offered an alternative. That substitute arrangement would have mitigated 100% of Scaramouche's damages, including the consequential damages of the property and copier leases.

¶ 46 We believe that *Maere* is apt. In *Maere*, the plaintiffs sued the defendants for breach of an oral contract to provide legal services in connection with a real estate purchase. *Maere*, 116 Ill.

App. 3d at 940. The defendant attorneys were to review abstracts of title and render a certificate of title. *Maere*, 116 Ill. App. 3d at 941. The defendants issued a certificate of title indicating that the plaintiffs were owners in fee simple of the lots that they purchased. *Maere*, 116 Ill. App. 3d at 941. When the plaintiffs discovered the existence of restrictive covenants, the defendants offered to obtain title insurance "to take care of any problem." *Maere*, 116 Ill. App. 3d at 941. However, the plaintiffs did not take advantage of that offer. *Maere*, 116 Ill. App. 3d at 941. When the plaintiffs again complained to the defendants, the defendants obtained title insurance that insured over the alleged defects. *Maere*, 116 Ill. App. 3d at 942. However, the policy was not acceptable to the plaintiffs. *Maere*, 116 Ill. App. 3d at 942. The plaintiffs then applied for a construction loan, but the lender noted the title defects. *Maere*, 116 Ill. App. 3d at 942. The lender agreed to make the loan if the plaintiffs obtained additional title insurance, but neither the plaintiffs nor the defendants would pay for it. *Maere*, 116 Ill. App. 3d at 942-43. The trial court granted summary judgment in the defendants' favor, finding that the plaintiffs' damages in not securing the loan were caused by their own inaction. *Maere*, 116 Ill. App. 3d at 943, 945. The appellate court applied the doctrine of avoidable consequences to hold that the plaintiffs could have avoided all their damages, including consequential damages, by accepting the title insurance policy and paying the fee for the extra coverage. *Maere*, 116 Ill. App. 3d at 946-49. Here, as in *Maere*, Scaramouche could have avoided all of its damages, including the costs of the leases, if Mayster had accepted Santacruz's offer to reinstate the APA. Eventually, Mayster accepted Santacruz's conditions, except that she refused to pay for the asset lien search. There is no evidence of the cost of such a search, but Mayster did not claim that the cost was what prohibited her from agreeing to it.

¶ 47 Lastly, Scaramouche argues that the obligation to mitigate its damages was suspended during Mayster's discussions with Santacruz. Scaramouche asserts that it should be awarded

"minimal" damages for that period. Even if the law permitted such damages, the record shows that Mayster did not negotiate the reinstatement in good faith. As in *Danada Square*, Mayster attached a condition that was so onerous (100% of the purchase price in cash at closing) that it killed the transaction. Then, Mayster tried to sell Barrington at a higher price. When Mayster received no offers, she closed the business purely for personal reasons. As noted, the law does not require Math to pay for Mayster's voluntary decision to close the business. Moreover, the appellate court will not reverse a case to permit recovery of nominal damages. *Morris v. Vulgamott*, 158 Ill. App. 434, 439 (1910).

¶ 48 Math additionally contends as reason to affirm that (1) Scaramouche failed to prove the element of damages in its case and (2) the court erroneously found that Math committed a breach of the APA. Because we have determined that Math properly prevailed on its affirmative defense, we need not address those arguments.

¶ 49                               III. CONCLUSION

¶ 50 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 51 Affirmed.

**No. 2-19-0840**

| | |
|---|---|
| **Cite as:** | *Mayster v. Santacruz*, 2020 IL App (2d) 190840 |
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 17-L-655; the Hon. Michael J. Fusz, Judge, presiding. |
| **Attorneys for Appellant:** | Diana C. Taylor, of DeSanto Morgan & Taylor, of Libertyville, for appellant. |
| **Attorneys for Appellee:** | Aharon S. Kaye, Kara Allen, and Valerie C. Lengerich, of Gutnicki LLP, of Skokie, for appellee. |