NOTICE

Decision filed 11/02/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210307-U

NO. 5-21-0307

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ESTATE OF WILLIAM A. SCHROEDER, Deceased | ) ) ) | Appeal from the Circuit Court of Jackson County. |
| (Carrollton Bank, | ) ) | |
| Petitioner-Appellant, | ) ) | |
| v. | ) ) | No. 16-P-68 |
| David H. Schroeder, as Independent Administrator of the Estate of William A. Schroeder, Deceased, | ) ) ) ) | Honorable Ella L. York, |
| Respondent-Appellee). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The order of the circuit court of Jackson County denying Carrollton Bank's petition for citations to recover assets from the beneficiaries of the decedent's trust is hereby affirmed where any recovery is barred under the equitable doctrines of *laches* and avoidable consequences.

¶ 2   This is an appeal from the Jackson County circuit court's order filed September 27, 2021, denying the petition filed by the petitioner, Carrollton Bank (bank), for citations to recover assets. The case arises from the administration of the estate of William A. Schroeder, deceased. The bank, a creditor of the decedent's estate, filed the petition seeking the recovery of five trust assets distributed to the beneficiaries of the decedent's trust (Schroeder Trust) in order to satisfy the

1

outstanding debt of $290,000 owed on two promissory notes that were personally guaranteed by the decedent. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The decedent died on August 28, 2016. Prior to his death, he executed his last will and testament and a declaration of trust on April 21, 2015. The will named the Schroeder Trust as the beneficiary of his residual estate. The trust was amended on February 5, 2016, and June 10, 2016. The will was admitted into probate on September 19, 2016. On February 8, 2017, the bank filed a claim against the estate for $632,961.05 owed on two promissory notes made by WAAL Investments, LLC (WAAL) and personally guaranteed by the decedent.

¶ 5     The first promissory note, executed on December 17, 2013, loaned WAAL $387,308.10 and was personally guaranteed by the deceased. The second promissory note, executed on October 22, 2014, loaned WAAL an additional $375,000 and was also personally guaranteed by the decedent.

¶ 6     On July 10, 2018, the bank filed a motion for entry of order for allowance of claim. On August 7, 2018, the trial court entered an order allowing the bank's claim against the estate. On October 23, 2018, an inventory of the decedent's estate was filed. On November 6, 2018, the court granted the bank's petition for current account. On January 3, 2019, an amendment to the inventory was filed. On January 2, 2019, the executor of the decedent's estate filed an interim account, which showed payments made to the bank on September 14, 2017, for $20,714.57; October 4, 2017, for $12,661.54; November 15, 2017, for $6330.77; December 19, 2017, for $6330.77; January 26, 2018, for $6330.77; March 6, 2018, for $12,660.94; and April 25, 2018, for $12,661.68. No other payments are noted through November 30, 2018. The interim account showed the estate's balance to be $11,053.15.

2

¶ 7    On April 11, 2019, the trial court entered an order granting the bank's petition for removal of executor and for citation to show cause, which removed Amy Curry as the executor of the decedent's estate for cause pursuant to section 23-2 of the Probate Act of 1975 (755 ILCS 5/23-2 (West 2018)).  The final account filed on May 2, 2019, showed no additional payments made to the bank through April 11, 2019.

¶ 8    On October 14, 2020, the bank filed a petition for citations to recover assets.  The petition iterated that an unsatisfied claim against the estate remained in the amount of $290,000.  The petition sought recovery of the following assets by the estate: (1) an undivided one-third interest in 100 acres, Wayne County, Illinois, transferred to David Schroeder and Matthew Schroeder on October 3, 2017; (2) a residence at 27 Pinewood Drive, Carbondale, Illinois, transferred to David Schroeder on February 7, 2018; (3) an undivided one-half interest in 120 acres located in Marion County, Illinois, transferred to Elizabeth Patterson in 2017; (4) 60 acres in Marion County, Illinois, transferred to Paul Schroeder, trustee of the Schroeder Family Trust (Family Trust); and (5) cash in the amount of $485,000 distributed to Paul Schroeder, trustee of the Family Trust.  The petition noted that a letter was received from David Schroeder, the administrator of the estate, in which he refused to seek recovery of assets from the trust to pay the estate's claims on July 7, 2020, and the bank therefore sought an order from the trial court authorizing the issuance of citations to recover assets requiring the beneficiaries of the trust to return the aforementioned assets to the estate.

¶ 9    On May 12, 2021, the respondents, David Schroeder, Matthew Schroeder, Elizabeth Patterson, and Paul Schroeder, filed an answer and affirmative defenses to the petition for citations to recover assets.  The following affirmative defenses were cited as to why the recovery sought by the bank should be barred: (1) the claim was filed outside the statute of limitations provided in section 505(a)(6) of the Illinois Trust Code (760 ILCS 3/505(a)(6) (West 2020)); (2) the recovery

sought was barred by the doctrine of *laches* where the bank waited an unreasonably long time to bring the cause of action despite its knowledge of the transfers, which was prejudical to the respondents (specifically, that the bank waited until October 14, 2020, to file its petition seeking recovery of trust assets—approximately 2½ to 3 years after the transfer of said assets); (3) recovery was barred by the doctrine of waiver where delay in seeking recovery resulted in the bank waiving its right to bring the cause of action; (4) the bank failed to mitigate its damages in delaying to file the cause of action; (5) recovery should be barred where the bank had unclean hands in waiting an unreasonably long time in seeking recovery; and (6) recovery would result in the bank being unjustly enriched where it was seeking to recover more than it was entitled as it sought the recovery of assets worth more than the amount still owed.

¶ 10     On May 14, 2021, the trial court held a hearing on the motion.[1]  As to the petition for citation to recover assets, David Schroeder, the decedent's son, testified that he was made executor of the decedent's estate after Amy Curry, the original executor named in the decedent's will, was removed by the trial court.  He testified that he received from the Schroeder Trust property in Carbondale located at 27 Pinewood Drive, one-sixth interest in a 100-acre farm located in Wayne County,[2] and one-tenth of the value of coins located in a safe deposit box later sold at auction for approximately $600,000.  The property on Pinewood was appraised at $210,000; the farm was appraised at $3300 per acre, valuing his one-sixth share at $55,000.  After the decedent's death, the Family Trust was created.  The assets of the Schroeder Trust went to the Family Trust.  It was his understanding that his four siblings and he shared equally in the Family Trust.  He received the

---

[1]The court also ruled on the motion addressed in case No. 5-21-0163.  In this appeal, we will only address those portions of the hearing relevant to the issues in this case.

[2]David, his brother Matthew, and the decedent each owned a one-third interest in the property prior to the decedent's death, and so David gained one-half of the deceased's one-third interest at the time of his death.

4

farm on October 3, 2017, and the Pinewood property on January 31, 2018, in accordance with the terms of the decedent's will. The conveyance of the Pinewood property was recorded on February 21, 2018. An inventory of the estate was filed in 2018, after both conveyances had already occurred.

¶ 11    Paul Schroeder, the decedent's brother, testified that he was a co-trustee along with Curry of the Schroeder Trust. He explained that there were 10 beneficiaries of the trust. In order to properly divide the trust, which contained the coin collection and properties, evenly amongst the 10 beneficiaries, it was decided that the trust would liquidate all assets and then the cash proceeds from the sale of the assets could be split 10 ways evenly. He was to be responsible for selling the coin collection and Curry was responsible for selling the properties. He eventually became aware, prior to her removal as trustee, that she had ceased making payments to the bank on the outstanding loan and disputes with Curry led to the trust modification, which also created the Family Trust. At the time the loan was executed between the bank and WAAL, it was his understanding that there was at least $350,000 in equity in WAAL, and the estate had between $150,000 and $200,000 in assets. Therefore, he argued that, had the bank been prudent in collecting the loan, there would have been sufficient assets to cover the debt. It was his understanding based on correspondence with Greg Heggemeier and the bank's counsel that Curry missed the payments on behalf of WAAL in July, August, and September 2017. Curry then used estate assets, rather than WAAL's assets, to pay back the past due amount owed for those three months. He also noted that, under the terms of the loan, it was immediately in default upon a change in management. Therefore, the loan was in default immediately upon the death of the decedent, and the bank could have, at that time, sought foreclosure or additional financial information.

5

¶ 12    Paul testified that the 60-acre property located in Marion was transferred to the Family Trust and the deed was recorded on June 4, 2018; that property was appraised for approximately $186,000. The one-half interest in the 120-acre farm in Marion County was appraised at $192,000, it was sold in May 2020, and the deed was recorded on June 5, 2020. The estate assets also included two coin collections, one worth between $80,000 and $88,000 and the other worth approximately $600,000. Once the specific bequests were distributed, he sold the remaining coins, netting approximately $604,000 or $605,000. In May 2018, approximately $485,000 from the proceeds of the coin collection was transferred from the Schroeder Trust to the Family Trust, of which he was the only trustee. Additionally, the farm located in Jackson County was sold for approximately $160,000, which was also transferred to the Family Trust, totaling $664,000 that was transferred from the Schroeder Trust to the Family Trust. However, only the proceeds from the sale of the coin collection were distributed amongst all five beneficiaries; the proceeds from the land sale went directly to two of the decedent's children as the land had been earmarked for them by the decedent. After satisfying the costs associated with the Family Trust, the entire principal amount was distributed amongst the five beneficiaries during 2018 and 2019. The only remaining asset in the Family Trust was the 60-acre farm in Marion County.

¶ 13    Paul recounted his observations of Curry's subpar performance in acting as executor, co-trustee of the Schroeder Trust, and in managing WAAL, which at the time of the decedent's death was valued between $950,000 and $1 million, an excess of approximately $300,000 due on the loan. In September 2017, the bank sent Curry a letter warning her that if she did not pay $60,000 in addition to keeping the loan current, it was going to bring legal action. He expected the bank to sue Curry for the amount owed on the loan. The bank did not take legal action and instead allowed

Curry to renew the loans. Once she again fell behind on the loan payments, the bank finally took legal action.

¶ 14    Matthew Schroeder, the decedent's son, testified that he received his one-fifth share of the $485,000 distributed by the Family Trust, some coins that were held in a safety deposit box appraised at approximately $40,000, a portion of an IRA, and a one-sixth interest in land that his brother David received.

¶ 15    Patricia Hoke, attorney for the decedent's estate and the Schroeder Trust, testified that in July 2017, she had a conversation with the bank's counsel wherein she told him that between WAAL's assets and the estate's assets, there should be enough assets to pay the bank's claim. She also sent an email with an inventory of WAAL's assets, showing the decedent's 99% ownership interest valued at $944,000. She denied making any statement that the trust assets would be used to pay the loan as there were sufficient funds to pay the loan from WAAL's assets.

¶ 16    Heggemeier, the bank's senior vice president, testified that the bank filed a claim against the decedent's estate in excess of $600,000 for payment of the WAAL promissory notes that were personally guaranteed by the decedent. He admitted that, at the time of the decedent's death, the bank's rights included the right to demand financial information from WAAL, rent rolls, and tax returns. Though these things were requested, they were not timely received from Curry. He also acknowledged that the bank could have demanded additional security on the loan, which it failed do. It was his understanding, based on after-acquired knowledge, that the first default on the loan occurred when the decedent transferred his ownership interest in WAAL to the Schroeder Trust prior to his death. His death then also triggered a default, and the adverse material change in the make up of WAAL also triggered a default.

7

¶ 17    Curry made payments on the loan in October, November, and December 2016, and January, February, March 2017. He noted that some of the payments were between 15 to 30 days late. The bank encouraged Curry early on following the decedent's death to sell WAAL's assets as she could not manage WAAL. He also admitted that he was aware that WAAL owned additional property that was not already secured under the loan, and that the bank could have demanded that WAAL provide additional security but failed to do so. Curry never provided personal financial information or her tax returns, and she did not look into refinancing the loan under her own name. He described Curry as "very elusive," and that arranging a meeting with her was a several-month-long process. He never received the requested financial documents from Curry in 2017.

¶ 18    Heggemeier recalled that he began to sense that things might not be right with Curry's management of WAAL in late 2016. The two individual notes matured after the decedent's death on October 17, 2017, and six-month renewals on each loan were executed on October 22, 2017, and November 21, 2017. Following the execution of the renewals, Curry made payments and sold property, which brought down the balance owed and reduced the debt. In April 2018, the bank again allowed Curry to renew the loans, which would mature in October 2018. Curry stopped making payments after August 2018. There was also a property sold for $132,000 in October 2018 that went toward the loan; however, property sales did not constitute a payment by Curry. Following the foreclosure action in Jackson County, the bank sold two of the properties subject to that judgment, and WAAL received credit on the loan for the net profits resulting from the sales. However, he explained that foreclosure sales reduce the value of the properties and had Curry sold those two properties herself, which she told him that she was going to do, the properties would have sold for a higher amount and the debt would have reduced that much more. He encouraged

8

Curry to sell the properties at every opportunity he had; however, he lost contact with her at some point.

¶ 19    Based on his relationship with the decedent and his family, Heggemeier knew that it was the decedent's intention that WAAL pay the loan and that his personal assets be distributed to his children. Heggemeier stated that his goal "was to have WAAL pay the debt, but it didn't happen and it couldn't happen and [Curry] was the reason why it didn't happen." He was not privy to all of the estate and trust dealings; however, his conversations with Paul and David tended to focus on Curry. They were all in agreement that Curry was a problem, and they needed to get her out. Lastly, he explained that his dealings with the decedent were based on a 20-year relationship, and he obviously would have sought more collateral in securing the loan had he known that the decedent was going to die.

¶ 20    On September 27, 2021, the trial court entered a written order denying the petitions for citations to recover assets from the beneficiaries of the Family Trust. In its recitation of the arguments of the parties, the court reiterated the respondents' argument that the distributions of the assets of the Family Trust met the requirement of section 505(a)(6) of the Trust Code, and that the bank's recovery should be barred under the doctrine of *laches*, the doctrine of avoidable consequences, and the doctrine of waiver. The bank now appeals.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, the bank argues that, pursuant to *Rush University Medical Center v. Sessions*, 2012 IL 112906, the trial court erred in denying its petition for citations to recover trust assets where it is owed $335,789.23 on an outstanding debt from two promissory notes that were personally guaranteed by the decedent, and where the decedent's estate is insolvent and lacks sufficient assets to satisfy the debt. The respondents argue that the bank's recovery should be

9

barred under the doctrines of *laches*, avoidable consequences, and waiver. We agree with the respondents that equity requires we affirm the order of the trial court.

¶ 23                                  A. *Rush*

¶ 24    The bank first argues that whether the Schroeder Trust is liable for the debts of the estate is not at issue where the trial court entered a final and appealable order on January 3, 2020, finding the trust liable to the estate's creditors for unpaid debts, and that decision cannot be overturned by this court as it was not appealed by either. Generally, a party who has the opportunity to file an appeal of a legal decision but fails to do so renders the decision the law of the case for future stages of the same litigation. *Liccardi v. Stolt Terminals, Inc.*, 178 Ill. 2d 540, 547 (1997).

¶ 25    During the January 3, 2020, hearing, the trial court found that the decedent's will directed the estate administrator to the Schroeder Trust upon insolvency to pay insolvent debts of the estate. The terms of the trust directed the same of the trustee. Therefore, the court determined that the Schroeder Trust was liable to pay claims of the insolvent estate upon demand by the personal representative of the estate. The court then stated that this finding was the limit of its ruling on the issue. Following this finding by the court, the bank declared its intent to file supplemental proceedings to seek payment from the remaining amount owed from the Schroeder Trust. This statement, along with the fact that Curry's counsel withdrew the request for a special finding under Illinois Supreme Court Rule 308 (eff. Oct. 1, 2019) on the motion to reconsider, demonstrates that the court's finding was not an appealable order.

¶ 26    The bank's substantive argument relies on the precedent established by the supreme court in *Rush*, 2012 IL 112906. In *Rush*, defendant established an irrevocable spendthrift trust in which he was the settlor and lifetime beneficiary and named himself as the "trust protector" with the power to appoint and remove trustees and change beneficiaries. *Id.* ¶ 3. He then made a $1.5

million charitable pledge to Rush University Medical Center to fund new construction. *Id.* ¶ 4. The construction was completed but defendant later became ill and blamed the medical center for his illness. *Id.* ¶¶ 5-6. He thereafter revoked and executed a new will that made no mention of the medical center pledge. *Id.* ¶ 6. The medical center filed suit against the trustees of the trust, seeking full payment of the pledge by relying on the common law rule that if a settlor creates a self-settled spendthrift trust for his own benefit, it is void as to existing or future creditors. *Id.* ¶ 9. The court, in applying the common law rule, found that "it is not a fraudulent *transfer* of funds that renders the trust void as to creditors under the common law, but rather it is the spendthrift provision in the self-settled trust and the settlor's *retention* of the benefits that renders the trust void as to creditors." (Emphases in original.) *Id.* ¶ 23. The court ruled that the trust was void as to creditors of the estate and awarded plaintiff the full amount of the pledge. *Id.* ¶ 36.

¶ 27 Here, we first note that both the decedent's will and trust addressed the issue of insolvency and directed that the trust be used to pay the debts of the estate. The language of these documents, as the trial court noted, indicate the decedent's intent that the trust assets be used to pay unresolved debts of the estate. This is not a situation where the decedent was attempting to hide assets or avoid creditors through the trust. Additionally, the Schroeder Trust, as discussed in *Rush*, was a self-settled spendthrift trust for the decedent's benefit. The trust would therefore be liable for the debts of the estate. However, whether the trust is liable for the debt of the insolvent estate is not dispositive in this case. Though we agree with the bank's recitation of the law, the facts of this case require our consideration of equitable doctrines.

¶ 28                                   B. *Laches*

¶ 29 *Laches* is an affirmative defense based in equity and requires the party raising it to show that there was an unreasonable delay in bringing an action and that the delay caused prejudice.

11

*PNC Bank, National Ass'n v. Kusmierz*, 2020 IL App (2d) 190521, ¶ 31. *Laches* "can preclude relief in an appropriate case where prejudice is demonstrated." *JPMorgan Chase Bank, N.A. v. Robinson*, 2020 IL App (2d) 190275, ¶ 30. The defense of *laches* is dependent on the particular facts of the case. *Slatin's Properties, Inc. v. Hassler*, 53 Ill. 2d 325, 329-30 (1972). *Laches* is a defense that is asserted against a party who has knowingly slept upon his rights and acquiesced for a great length of time, and its existence depends upon whether, under all the circumstances of a particular case, a party is chargeable with want of due diligence and failing to institute proceedings before he did. *La Salle National Bank v. Dubin Residential Communities Corp.*, 337 Ill. App. 3d 345, 350-51 (2003).

¶ 30    Here, both elements to bar relief based on *laches* are satisfied. First, the record demonstrates that the bank's delay in seeking payment of the decedent's estate's outstanding debt was unreasonable. The record is replete with missed opportunities by the bank in enforcing payment of its claim. The bank's claim against the estate was entered in 2016, yet it sought no full payment on the debt at that time, despite its legal right to do so. The bank then allowed Curry, who Heggemeier described as "very elusive," to execute renewals on the notes in 2017 and again in 2018. The bank allowed the renewals without any additional collateral from Curry. There were also indications that she was not competent to manage WAAL and the bank encouraged her over a course of years to sell WAAL's assets. The decedent died in 2016, and the bank's claim was entered shortly thereafter, yet the bank failed to exercise any of its legal rights in actually collecting payment on the claim until 2020, long after all the assets of the trust had been distributed to the beneficiaries.

¶ 31    The bank's recovery would result in prejudice where it delayed in asserting available legal remedies, where the estate was not initially insolvent, and where WAAL's assets at the time of the

12

decedent's death exceeded the amount owed on the loan by approximately $300,000. The bank sat on its rights for so long, that in order to satisfy the debt, the court would now be required to undue all of the distributions of the Family Trust, which would result in the decedent's children returning their inheritances in order to pay the debt. However, as Heggemeier noted, the cause of this situation and the outstanding debt, is the result of Curry's actions, not the beneficiaries. The beneficiaries would effectively lose a large portion of their inheritance because the bank waited too long to go after Curry for payment of the debt with WAAL assets, which were more than enough to cover the loan. The bank cannot now, after sleeping on its rights and allowing Curry to continue to renew the loans without collateral, turn around and ask this court to take back trust assets that were distributed at a time when the loan could have been paid in full by WAAL, and cause the beneficiaries to pay the debt even though no action was taken against Curry, despite the bank's recognition that she was the bad actor. Therefore, the relief sought by the bank would result in prejudice.

¶ 32    As both elements of *laches* are satisfied by the particular facts of this case, the trial court did not err in denying the bank's petition for citations for recovery of trust assets.

¶ 33                          C. Avoidable Consequences

¶ 34    Another affirmative defense raised by the respondents was the doctrine of avoidable consequences. Illinois has long recognized the doctrine of avoidable consequences, which prevents a party from recovering damages for consequences which that party could reasonably have avoided. The supreme court has explained that the law imposes on a party injured from another party's breach of contract the active duty to make reasonable efforts to minimize the injury. A party's negligence or willfulness cannot allow the damages to be unnecessarily enhanced. *Cedar Rapids & Iowa City Ry. & Light Co. v. Sprague Electric Co.*, 280 Ill. 386, 391 (1917).

13

¶ 35    The doctrine of avoidable consequences "addresses itself to the equity of the law that a plaintiff should not recover for those consequences of defendant's act which were readily avoidable by the plaintiff.  Sutherland on Damages, (1844), vol. 1, p. 226, *et seq.*" (Internal quotation marks omitted.)  *Kelly v. Chicago Park District*, 409 Ill. 91, 98 (1951).  "The general rule is that it is the duty of a party injured by a breach of contract or tort to make a reasonable effort to avoid damages therefrom, and such damages as might by reasonable diligence on his part have been avoided are not to be regarded as the natural and probable result of plaintiff's acts, and therefore there can be no recovery for damages which might have been avoided by reasonable effort on the part of the person injured."  *Nelson v. Buick Motor Co.*, 183 Ill. App. 323, 325 (1913); see *Maere v. Churchill*, 116 Ill. App. 3d 939, 946-47 (1983).

¶ 36    Here, the record establishes several means through which the bank could have reasonably avoided its losses.  As previously discussed, the bank could have called the loan due at the time of the decedent's death, which could have been paid entirely with assets held by WAAL.  The bank could have either refused to execute the renewals, calling the debt due sooner, or could have required additional collateral in executing the renewals.  The bank had legal remedies available to it that were not available to the beneficiaries of the trust in ensuring the debt was satisfied.  The longer the bank waited to use its legal remedies, the greater its damages became, and the fewer options it had in receiving payment.  Now, approximately four years later, the only realistic way for the bank to recover the sum owed is recovery of the trust assets as the estate is insolvent and WAAL's assets diminished to the point that they did not cover the entire amount owed.  Therefore, we find that the court did not err in denying the petition where the bank's actions caused avoidable consequences.

¶ 37          III. CONCLUSION

¶ 38 Based on the foregoing, we find that the equitable doctrines of *laches* and avoidable consequences are applicable where the actions of the bank, though legally permissible, would result in an inequitable outcome.  Therefore, the order of the circuit court of Jackson County denying the bank's petition for citations for recovery of assets is hereby affirmed.

¶ 39 Affirmed.